## PARKER v. ELLIS, GENERAL MANAGER, TEXAS PRISON SYSTEM.

No. 38. Argued January 20, 1960.—Decided May 16, 1960.

*Frank M. Wozencraft* argued the cause for petitioner. With him on the brief was *William F. Walsh.*

*Leon F. Pesek,* Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *Will Wilson,* Attorney General, and *Linward Shivers,* Assistant Attorney General.

PER CURIAM.

This is an application for a writ of habeas corpus brought in the United States District Court for the Southern District of Texas alleging unlawful detention under a sentence of imprisonment following a trial in the state court in which petitioner was, according to his claim, denied due process of law as guaranteed by the Due Process Clause of the Fourteenth Amendment of the United States Constitution. After hearing, the District Court dismissed the petition. The Court of Appeals for the Fifth Circuit, with one judge dissenting, affirmed the order of dismissal, 258 F. 2d 937, to which opinion reference is made for the facts. A petition for certiorari to

review this judgment presented so impressive a showing for the exercise of this Court's discretionary jurisdiction that the case was brought here with leave to the petitioner to proceed *in forma pauperis,* 359 U. S. 924, and his motion for the assignment of counsel was duly granted. 359 U. S. 951.

Before the case could come to be heard here, the petitioner was released from the state prison after having served his sentence with time off for good behavior. The case has thus become moot, and the Court is without jurisdiction to deal with the merits of petitioner's claim. "The purpose of the proceeding defined by the statute [authorizing the writ of habeas corpus to be issued] was to inquire into the legality of the detention, and the only judicial relief authorized was the discharge of the prisoner or his admission to bail." *McNally* v. *Hill,* 293 U. S. 131, 136. "Without restraint of liberty, the writ will not issue." *Id.,* 138. See also *Johnson* v. *Hoy,* 227 U. S. 245.\* "It is well settled that this court will not proceed to adjudication where there is no subject-matter on which the judgment of the court can operate." *Ex parte Baez,* 177 U. S. 378, 390. We have applied these principles to deny the writ of certiorari for mootness on the express ground that petitioner was no longer in respondent's custody in at least three cases not relevantly different from the present one. *Weber* v. *Squier,* 315 U. S. 810; *Tornello* v. *Hudspeth,* 318 U. S. 792; *Zimmerman* v. *Walker,*

---

\*It is likewise true that "a motion for relief under 28 U. S. C. § 2255 [relevant only to federal sentences] is available only to attack a sentence under which a prisoner is in custody." 358 U. S., at 420. Contrary to the unconsidered assumption in *Pollard* v. *United States,* 352 U. S. 354, this was decided after full deliberation only a year ago. See the opinion of MR. JUSTICE DOUGLAS, 358 U. S., at 418, and the opinion of MR. JUSTICE STEWART for the Court on this point, 358 U. S., at 420, in *Heflin* v. *United States,* 358 U. S. 415. Of course Rule 35 of the Federal Rules of Criminal Procedure is not available for state sentences.

319 U. S. 744. In all these cases there was custody as the basis for habeas corpus jurisdiction until the cases reached here. In *Weber,* the respondent's custody ceased because the petitioner had received the benefits of the United States Parole Act. In *Tornello* the petitioner had been pardoned, and was no longer in the custody of anyone. In *Zimmerman* petitioner had been unconditionally released and was also no longer in the custody of anyone. These cases demonstrate that it is a condition upon this Court's jurisdiction to adjudicate an application for habeas corpus that the petitioner be in custody when that jurisdiction can become effective. It is precisely because a denial of a petition for certiorari without more has no significance as a ruling that an explicit statement of the reason for a denial means what it says. Accordingly, the writ of certiorari is dismissed for want of jurisdiction.

Since the case has become moot before the error complained of in the judgment below could be adjudicated, the case is remanded to the Court of Appeals to vacate its judgment and to direct the District Court to vacate its order and dismiss the application.

MR. JUSTICE HARLAN, joined by MR. JUSTICE CLARK, also considers this case moot on a further ground. It appears that petitioner has outstanding against him felony convictions in a number of other States. Under Texas law any one of those convictions would carry the same consequences with respect to petitioner's exercise of civil rights in Texas (Election Code Art. 5.01) as his conviction in this case. See *Harwell* v. *Morris,* 143 S. W. 2d 809, 812–813. This Court is as much bound by constitutional restrictions on its jurisdiction as it is by other constitutional requirements. The "moral stigma of a judgment which no longer affects legal rights does not present a case or controversy for appellate review." *St. Pierre* v. *United States,* 319 U. S. 41, 43.

MR. CHIEF JUSTICE WARREN, with whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE BRENNAN join, dissenting.

If the Court is right in holding that George Parker's five-year quest for justice must end ignominiously in the limbo of mootness, surely something is badly askew in our system of criminal justice. I am convinced the Court is wrong. Even assuming *arguendo* that we could not enter a *nunc pro tunc* order, I believe that we still would be able to grant relief.

We have here the case of a man who was convicted of a felony in flagrant disregard of his constitutional right to assistance of counsel. Since the Court terms his claim an "impressive" one, lengthy discussion of its merits is unnecessary. Still, it is not amiss briefly to describe what it is the Court here declines to decide.

In 1954, petitioner was tried in the District Court of Moore County, Texas, on a charge of forging a check. He was then 67 years of age and, respondent concedes, in "failing health." The judge refused to appoint counsel to represent him.[1] He was convicted and received a sen-

---

[1] "The COURT. Do you want a trial by jury or without a jury?

"Mr. PARKER. Well, it is immaterial to me, Judge. I don't have any attorney.

"The COURT. Well, you are going to have to make up your mind. It is certainly immaterial to the court.

"Mr. PARKER. I guess a jury then.

.        .        .        .        .

"The COURT. Do you have a lawyer hired?

"Mr. PARKER. No, sir, I don't.

"The COURT. The law does not require the court to appoint an attorney to represent a defendant where he has a trial by jury and it is not the practice of this court to appoint any attorney to represent the defendant. It is up to him to arrange for his own counsel. Now, if you are eligible for a suspended sentence, why, then, the court would get some lawyer to advise you about the procedure in filing

tence of seven years. To any lawyer's eye—and it is not at all clear that the restriction to lawyers is warranted—his trial was a sham. Although the testimony directly bearing on the issue of forgery was not strong,[2] petitioner's conviction is hardly surprising, for the prosecution's case consisted in large part of a potent mélange of assorted types of inadmissible evidence—introduced without objection by petitioner.[3] But petitioner suffered as much from errors of omission as he did from errors of commission. Petitioner now alleges—and respondent does not deny—that the victim of the alleged forgery was

---

your application for a suspended sentence but only for that part and only if you are eligible for a suspended sentence.

.      .      .      .      .

"Mr. Parker. I will not apply for any suspended sentence."

[2] For example, the woman on whose account the check was drawn was never called as a witness. The only evidence regarding petitioner's lack of authority from her to sign the check is contained in this bit of testimony—of highly questionable admissibility—by the woman's son:

"Q. Did your mother tell you that she authorized him to write checks on her?

"A. No, sir.

.      .      .      .      .

"Q. And, your mother didn't authorize anyone to use that signature?

"A. No, sir."

[3] In his brief, respondent stated that it was "not necessary to discuss" petitioner's argument that his trial was gravely infected by error, because these matters of state law "are not properly before this Court." Obviously they are very much before the Court in a deprivation of counsel case, for they are among the factors which indicate to what degree the defendant has been prejudiced. On oral argument, respondent's counsel, the Assistant Attorney General of Texas, freely answered the Court's questions regarding these issues, and, with admirable candor, expressed his view that as a matter of fact—though not as a matter of law—no layman could competently defend himself against a criminal charge.

petitioner's mother-in-law and that the principal prosecution witness was his brother-in-law, a "bitter enemy"; [4] but petitioner introduced no evidence to this effect at the trial.[5] Nor is this strange, for petitioner's halting attempts to defend himself disclose his utter ineptness in the courtroom. After the prosecution had examined its witnesses—unhampered by searching cross-examination—petitioner conducted what respondent terms "a premeditated type of defense which might have been successful on another jury."

Item:

"Direct examination by Mr. PARKER:

"Q. Ted, you go ahead and tell the court about my condition and how you have known me—tell the jury?

"A. Well, do I understand it right?

"Q. Huh?

"A. You mean your physical condition, so forth and so on?

"Q. Yes. Just go ahead and tell the jury about what you know?

"A. Well, his physical condition, according to everything, is bad or, at least, the doctors say so, you know. I couldn't—as far as the checks, I don't

---

[4] The allegation is supported by an affidavit of petitioner's wife.

[5] In fact, the testimony of the brother-in-law conveyed the opposite impression:

"Q. You know G. L. Parker, don't you?

"A. I know of him.

"Q. Well, he is the defendant sitting here, isn't he?

"A. I think so.

"Q. Well, as a matter of fact, you know he is, don't you, Mr. Quattlebaum?

"A. Yes.

"Q. How long have you known him?

"A. Well, a long time."

know; but, I do know that he needs medical care. Is that what you meant, George?

"Q. Yes, I guess so; just go ahead and tell them what you know about me. That is all—only—that is all I want to ask—I am just leaving mine up to them, you know?

"The COURT. Do you know what he is driving at—what he wants?

"A. Well, if I understood it, the condition, you know—

"The COURT. That is up to you too.

"[The PROSECUTOR]. You got anything else?

"Mr. PARKER. No. Go ahead and ask him."

Item:

"The COURT. Are you through?

"Mr. PARKER. Judge, here are some letters I would like for the jury to see.

"The COURT. We can't give the letters to the jury.

"Mr. PARKER. For—from the doctors?

"The COURT. No, sir.

"Mr. PARKER. That is all."

This is enough to give the flavor of the "trial." It is difficult to recall a case which more clearly illustrates the helplessness of the layman when called upon to defend himself against a criminal charge. Judge, now Chief Judge, Rives, who dissented from the judgment of the Court of Appeals, was clearly correct in stating:

"Upon such a record, it would appear that Parker's efforts to defend himself were little short of farcical. In view of the small amounts of the checks, his family connection with the Quattlebaums, and the open way in which the checks were payable to and endorsed by Parker, it is quite possible that he may have had a defense to the charge of forgery, or at least that miti-

gating circumstances might have been shown. The record . . . shows that he suffered badly from the lack of assistance of counsel, and tends to corroborate his claim of extreme illness." 258 F. 2d 937, 944.

But George Parker's unhappy experience with the law was not destined to end with the trial. Instead, time after time the courts have turned aside his applications for redress. There has hardly been a minute in the past five years that Parker's case has not been before a court. He was convicted in November, 1954, and on March 23, 1955, the Court of Criminal Appeals of Texas affirmed his conviction in a brief opinion. 276 S. W. 2d 533. Parker then applied to the Court of Criminal Appeals for habeas corpus, but his petition was denied on September 21, 1955, without a hearing. On February 27, 1956, this Court denied certiorari.[6] 350 U. S. 971. Next, on May 31, 1956, Parker turned to the Federal District Court and sought relief by way of habeas corpus. The district judge denied his petition on June 24, 1957, after his thrice-repeated request for a lawyer had been thrice-ignored. The Court of Appeals affirmed on August 29, 1958. 258 F. 2d 937. Parker petitioned for certiorari on October 24, 1958; and this Court granted the petition on March 2, 1959. 359 U. S. 924. At last an attorney was appointed to represent Parker's interests. 359 U. S. 951. Then, on June 6, 1959, Parker was released from the penitentiary—almost five years after his conviction, three years after he had applied to the Federal District Court for relief, more

---

[6] Petitioner suffered throughout from the poverty which prevented him from hiring an attorney and from obtaining a transcript of the record of his trial. Left to his own devices, his petitions—at least his first petition to this Court—did not sufficiently reveal the prejudice which he suffered at the trial because of the failure of the trial court to appoint an attorney.

than seven months after he had petitioned this Court for certiorari, and more than three months after certiorari had been granted. Now that petitioner has dutifully fulfilled the requirement that he exhaust—an apt word—all other remedies,[7] he is told that it is too late for the Court to act.

## I.

The Court does not suggest that this strange result is a happy one. But it appears to believe it is bound by precedent to the view that, because of the nature of the habeas corpus remedy, "it is a condition upon this Court's jurisdiction . . . that the petitioner be in custody when that jurisdiction can become effective." Consequently, the Court does not express any view on the mootness question considered *de novo*. Since, as will appear, I do not regard the decisions upon which the Court relies as at all decisive, I am obliged to consider whether the habeas corpus statute, 28 U. S. C. §§ 2241–2254, entitles us to pass upon the merits of this controversy. I conclude that it does.

It is quite true that the statute provides that the writ of habeas corpus will not issue unless the applicant is "in custody." 28 U. S. C. § 2241 (c). But the statute does not impose this same restriction upon the grant of relief. Rather, the federal courts are given a broad grant of authority to "dispose of the matter as law and justice require." 28 U. S. C. § 2243. In the case at bar, the "in custody" prerequisite to issuance of the writ is no longer relevant, because the function of the writ—to provide and to facilitate inquiry into the validity of the applicant's claim—has already been fully served.[8] The district judge

---

[7] See 28 U. S. C. §§ 2242, 2254; *Darr* v. *Burford,* 339 U. S. 200.

[8] See *Ex parte Baez,* 177 U. S. 378, 389; Ingersoll, History And Law of Habeas Corpus, 2. In *Baez,* the Court pointed out that, as a practical matter, the writ could not be issued and the applicant pro-

ordered that petitioner's application be heard upon affidavits, depositions, and the record of the trial,[9] and the latter alone conclusively substantiates petitioner's allegations. Thus all that remains is to determine what form of relief should be given. Under the circumstances of this case, "law and justice require" that the patent invalidity of Parker's conviction be proclaimed.

Granting Parker relief would not only comport with the statutory mandate, but would also be in keeping with the spirit of the writ. Habeas corpus, with an ancestry reaching back to Roman Law,[10] has been over the centuries a means of obtaining justice and maintaining the rule of law when other procedures have been unavailable or ineffective. The early years of its development in England were distinguished by the role it played in securing enforcement of the guarantees of Magna Charta.[11] But even the Great Writ was not secure from the pressures of the English Crown, and perhaps the most effective method

---

duced for a hearing before the date scheduled for his release, so that mootness could be anticipated. 177 U. S., at 389–390. This was a proper application of the "in custody" requirement.

[9] 28 U. S. C. §§ 2246, 2247. Petitioner secured the transcript through the financial assistance of a fellow prisoner to the extent of $25.

[10] See Church, Habeas Corpus (2d ed. 1893), 2–3.

[11] See 2 Hallam, Europe During the Middle Ages, 552; 9 Holdsworth's History of English Law 111–125; Hurd, Habeas Corpus (2d ed. 1876), 66–74.

It is instructive to recall the following passages of the Magna Charta:

"39. No free-man shall be seized, or imprisoned, or dispossessed, or outlawed, or in any way destroyed; nor will we condemn him, nor will we commit him to prison, excepting by the legal judgment of his peers, or by the laws of the land.

"40. To none will we sell, to none will we deny, to none will we delay right or justice." Magna Charta, reprinted in S. Doc. No. 232, 66th Cong., 2d Sess. 17.

of eviscerating the remedy proved to be procrastination.[12] Abuses such as the delay of over four months in the famous *Jenkes* case finally caused Parliament to enact the Habeas Corpus Act of 1679, 31 Car. II, c. 2, which required returns on the writ to be made within specified periods of time and which proscribed the judiciary's tactic of refusing to issue the writ during "Vacation-Time."[13] The summary nature of the remedy thus became es-

---

[12] "Prerogative then reigned. The obnoxious members of the late Parliament were seized and imprisoned for words spoken in debate. The writ of habeas corpus was rendered powerless even to liberate them on bail by the servile *procrastination* of the court who dared not expressly to *deny* the right. And finally JOHN ELLIOTT, the most distinguished leader of the popular party, doomed to imprisonment and loaded with fines by a court usurping jurisdiction, died in the Tower—a martyr to parliamentary freedom of speech." Hurd, Habeas Corpus (2d ed. 1876), 78. See also 3 Blackstone Commentaries (15th ed. 1809), 133–135; authorities cited in note 13, *infra*.

[13] ". . . Jenkes, a citizen of London on the popular or factious side, having been committed by the king in council for a mutinous speech in Guildhall, the justices at quarter sessions refused to admit him to bail, on pretence that he had been committed by a superior court; or to try him, because he was not entered in the calendar of prisoners. The chancellor, on application for a habeas corpus, declined to issue it during the vacation; and the chief-justice of the king's bench, to whom, in the next place, the friends of Jenkes had recourse, made so many difficulties that he lay in prison for several weeks." Hallam, History of England (8th ed. 1855), 10–11. See also 3 Blackstone Commentaries (15th ed. 1809), 134–135; Church, Habeas Corpus (2d ed. 1893), 24–25; 6 Howell's State Trials 1190–1207; Hurd, Habeas Corpus (2d ed. 1876), 82. It is plain from these other sources that the "several weeks" mentioned in Hallam's account refers only to one period of Jenkes' incarceration. There is also some dispute among these authors with respect to the historical significance of the *Jenkes* case. The nature of the abuses which led to passage of the Act is clear, however; and, for present purposes, it is immaterial which particular case aroused the greatest public sentiment.

tablished, and our own statutory writ has this same stamp.[14]

The general problem we confront in the case at bar, then, is hardly novel in the history of the writ—an intolerable delay in affording justice and the absence of any other remedy.[15] The causes, to be sure, have changed with the times. Instead of the arbitrariness of judges, Parker has had to contend with the time-consuming nature of our system of appellate review and collateral attack. We cannot expect history to tell us exactly how to cope with this problem, because it simply did not exist in the early days of the common-law writ, when there was little if any appellate review of the then relatively simple habeas corpus proceedings.[16] But history does provide general guidance. This guidance is incompatible with the idea that the writ designed as an effective agent of justice has become fossilized so that old problems, once thought to have been solved, are now insurmountable because they have taken slightly new forms. The Court has not hesitated to expand the scope of habeas corpus far beyond its traditional inquiry into matters of technical "jurisdiction." The statute permitted this adaptation in the interests of "law and justice," and the Court has responded to the demands of that compelling standard. We have the same

---

[14] Under our habeas corpus statute, the court is required to issue the writ or a show-cause order "forthwith" unless the petition does not state a cause for relief. The return must normally be made within three days, and the hearing held within five days thereafter. 28 U. S. C. § 2243.

[15] Respondent's attorney, the Assistant Attorney General of Texas, conceded during oral argument that there is no other judicial avenue open to petitioner.

[16] See 2 Spelling, Injunctions (2d ed. 1901), 1159–1165. Cf. Ingersoll, History And Law of Habeas Corpus, 32–33; 9 Holdsworth's History of English Law 123–124.

latitude in this case, and the character of the writ does not require us to impose upon applicants what will amount to a "time-is-of-the-essence" strait jacket.

## II.

The Court apparently believes that these considerations are foreclosed by prior decisions. The fact is, however, that while the writ-remedy argument seems never to have been squarely presented to this Court, the weight of authority favors petitioner.

In *Pollard* v. *United States*, 352 U. S. 354, the Court was confronted with a mootness question identical to that presented here. *Pollard* involved a collateral attack upon a conviction by way of motion under 28 U. S. C. § 2255. After certiorari had been granted, the petitioner was released from prison. Nevertheless, this Court held that the case was not moot. But, just as the habeas corpus statute provides that the writ "shall not extend to a prisoner unless . . . [h]e is in custody," [17] so too is § 2255 available only to a "prisoner in custody under sentence of a court." Moreover, as this Court has noted, § 2255 affords the same relief as habeas corpus, with the difference, which is not material here, that a § 2255 motion is filed in the sentencing court instead of in the court of the district of incarceration.[18] Consequently, if Pollard's

---

[17] 28 U. S. C. § 2241 (c).

[18] Section 2255, of course, is available only with respect to federal judgments, whereas habeas corpus is available to attack either state or federal judgments.

The legislative history of § 2255 and its relationship to habeas corpus are exhaustively discussed in *United States* v. *Hayman*, 342 U. S. 205, 210–219. See also *Heflin* v. *United States*, 358 U. S. 415, 420–421 (concurring opinion). While I share the views expressed by MR. JUSTICE DOUGLAS in *Heflin, supra*, at 417–418, I believe that if § 2255 and habeas corpus are to be treated as synonymous when

claim was not moot, it is difficult to perceive why Parker's claim is.

The Court recognizes the difficulty posed by *Pollard,* and solves it by stating that this aspect of *Pollard* was predicated upon an "unconsidered assumption" which was overruled by *Heflin* v. *United States,* 358 U. S. 415, "after full deliberation." But *Heflin* did not purport to discard *Pollard,* and there is no inherent inconsistency between these two decisions. In *Heflin,* the Court decided that a prisoner could not secure § 2255 relief from a sentence which he had not yet begun to serve because he was not yet "in custody" pursuant to that sentence. But the mootness problem dealt with in *Pollard* was not involved in *Heflin.* A construction of § 2255 similar to the construction of the habeas corpus statute proposed above would harmonize *Heflin* and *Pollard*; it is only the Court's opinion in this case which tends to make them irreconcilable. Thus the Court's argument comes full circle.

Moreover, it is curious that the Court, in dealing with the cases upon which it relies, does not exhibit the same attitude that is reflected by its treatment of *Pollard.* The three cases which constitute the principal basis for the Court's judgment are *Weber* v. *Squier,* 315 U. S. 810; *Tornello* v. *Hudspeth,* 318 U. S. 792; and *Zimmerman* v. *Walker,* 319 U. S. 744.[19] While in *Pollard* the Court ren-

---

the result is to deny their availability, they should be treated in the same manner when this would afford an applicant relief.

[19] The Court mentions three other decisions, but apparently does not rest upon them. In *McNally* v. *Hill,* 293 U. S. 131, the Court held that a person who was serving the first of two consecutive sentences could not attack the second at that time. His habeas corpus remedy, held the Court, lay before him. Petitioner's problem is quite different. His remedy, under the Court's decision, is gone forever. It is also relevant to note that in *McNally* the Court suggested that there was another type of relief available to the

dered judgment after plenary consideration, in these three cases the Court simply denied certiorari, and it did so in terse orders without benefit of briefs or oral arguments. The opinion of the Court in the case at bar hardly seems consistent with this Court's oft-repeated warnings concerning the lack of significance of denials of certiorari. Furthermore, when the records in *Weber, Tornello,* and *Zimmerman* are examined, it becomes unmistakably clear that the orders in those cases were not based upon the theory now espoused by the Court.

*Weber* was the first of the trio. There the petitioner was paroled while his petition for certiorari was pending, and the Court thereupon denied the petition on grounds of mootness. Since a lower court had issued a writ of habeas corpus prior to the parole, *Weber* would be directly in point if the Court's order had rested upon the premise that petitioner, as a parolee, was no longer in custody within the meaning of the habeas corpus statute. But the respondent did not suggest that the petition be denied on this ground. Rather, his sole argument was that the case was moot because the petitioner was no longer in *his* custody. The only case respondent cited, *Van Meter* v. *Sanford,* 99 F. 2d 511, held that a habeas corpus action becomes moot when the respondent loses custody and is thereby disabled from complying with the order which might be necessary upon remand—in Weber's case, an order of discharge. It was this theory the Court adopted in denying certiorari because petitioner was "no longer in the respondent's custody." [20] It is instructive to note

petitioner even before he commenced serving his second sentence. *Id.,* at 140. *Johnson* v. *Hoy,* 227 U. S. 245, involved a habeas corpus action brought prior to trial, which obviously presents questions entirely different from those posed by the case at bar. For a discussion of *Ex parte Baez,* 177 U. S. 378, see note 8, *supra.*

[20] Had the case been argued, conceivably the petitioner would have urged upon the Court the writ-remedy distinction, and con-

that the language of the *Weber* order [21] is identical to the language the Court used shortly thereafter to dispose of a case on grounds of mootness where the petitioner had been transferred from one custodian to another, but where he was still in the penitentiary. See *United States ex rel. Innes* v. *Crystal,* 319 U. S. 755. Whatever may be said of the *Weber* theory of mootness,[22] it is irrelevant to the instant case, where it would be unnecessary to issue an order of discharge.

The second case discussed by the Court is *Tornello* v. *Hudspeth, supra,* where a petition for certiorari was

---

tended that no order of discharge would be necessary in his case because parole was *not* custody. It is hardly surprising that the Court did not explore this intricate problem *sua sponte;* nor is it surprising that the petitioner did not suggest this approach, inasmuch as the Court's opinion left open the possibility that he could maintain a habeas corpus action against a new respondent.

It may be noted that the Courts of Appeals, in considering the difficult question whether parole is sufficient restraint to serve as a basis for a habeas corpus action, seem to have taken divergent views of the significance of *Weber.* The *Weber* order, unillumined by the record, is hardly a model of clarity, and it is natural enough that some—though not all—courts have been misled. Compare *Siercovich* v. *McDonald,* 193 F. 2d 118 (C. A. 5th Cir.), and *Adams* v. *Hiatt,* 173 F. 2d 896 (C. A. 3d Cir.), with *Factor* v. *Fox,* 175 F. 2d 626, 628–629 (C. A. 6th Cir.), and *Shelton* v. *United States,* 242 F. 2d 101, 109–110 (C. A. 5th Cir.). See also *Anderson* v. *Corall,* 263 U. S. 193, 196. ("While [parole] is an amelioration of punishment, it is in legal effect imprisonment.") But cf. *Wales* v. *Whitney,* 114 U. S. 564.

[21] The order reads as follows:
"Petition for writ of certiorari to the Circuit Court of Appeals for the Ninth Circuit denied on the ground that the cause is moot, it appearing that petitioner has been released upon order of the United States Board of Parole and that he is no longer in the respondent's custody. The motion for leave to proceed further *in forma pauperis* is therefore also denied."

[22] The Court finally came to grips with this problem in *Ex parte Endo,* 323 U. S. 283, 304–307.

denied because "petitioner has been pardoned by the President and . . . is no longer in respondent's custody." Since the Court used the verbal formula of *Weber* and *Innes,* and since the only case cited was *Weber,* it is evident that the Court relied entirely upon the *Weber* theory so far as the custody question was concerned. It is unfortunate that the Court did not consider the significance of the fact that there was no custody at all in *Tornello* and that hence no order of discharge would have been necessary. But the Court's failure to examine this aspect of the mootness problem robs the case of controlling authority. No doubt the Court's uncritical application of the *Weber* rule is attributable not only to the fact that the parties did not discuss the mootness issue at all, but also to the Court's reliance upon the full and unconditional pardon as an alternative ground of mootness.[23]

Not surprisingly, perhaps, the order in the third case, *Zimmerman* v. *Walker, supra,* relied solely upon *Weber* and *Tornello,* and repeated the "released from the respondent's custody" phrase. In that case, respondent filed a suggestion of mootness in which he mentioned the total lack of custody, but in which he relied primarily upon the ground which had proved successful in the past—the absence of custody *by him.* But it is unnecessary to explore this case further, inasmuch as no writ or rule to show cause had ever issued. Since custody is a prerequisite for issuance of the writ, the case was clearly moot; but it is just as clearly irrelevant.

Orders of this character do not provide a solid basis for disposition of Parker's case. The "law and justice" standard of the statute does.

---

[23] This aspect of the mootness question as it relates to the instant case is discussed *infra,* pp. 591–594. It may be noted that *Tornello's* conclusion as to the effect of a pardon is not unchallengeable. See 3 The Attorney General's Survey of Release Procedures 267–294.

## III.

The concurring opinion raises another objection to granting Parker relief. While the Court's opinion simply construes the statute, the concurring opinion construes the Constitution. The Court's opinion would not foreclose Congress from authorizing relief in a case like Parker's; the concurring opinion would. While the Court's decision is based on the theory that nothing can be done for Parker because of the nature of the relief authorized by the habeas corpus statute, the concurrence is grounded upon the view that Parker has such an insubstantial interest in securing an adjudication that his claim could not present a "case or controversy" under Art. III, § 2 of the Constitution, regardless of what relief a statute were to authorize.[24]

One could take exception to the factual premise of this conclusion. The evidence of record which is relied upon to establish the existence and number of Parker's convictions leaves much to be desired,[25] and there is nothing to

---

[24] See *Muskrat* v. *United States*, 219 U. S. 346.

[25] At the trial, the sheriff testified from an F. B. I. record with respect to Parker's prior convictions. The record was not introduced into evidence, its nature was not disclosed, and it was not authenticated in any manner. Moreover, the sheriff's description of the information in the record was confused, and, in response to a question by Parker, he conceded that "some" of the cases were never "disposed of," so far as the record indicated. During the habeas corpus proceedings, respondent submitted a record from the Texas Department of Public Safety which purported to summarize Parker's criminal history. It is, so far as appears, merely a compilation of information from various sources for Department use, and it was submitted only as evidence that Parker was being held pursuant to the judgment in this case. Its usefulness with regard to the mootness issue is further diminished by the fact that the Parker, or Parkers, whose convictions appear on the record are listed under seven different first and middle names.

indicate whether Parker has been relieved of the civil consequences of any of these convictions under statutes designed to mitigate the effect of civil disability laws.[26] Moreover, *Harwell* v. *Morris*, 143 S. W. 2d 809 (Tex. Civ. App.), the decision which the concurring opinion cites as establishing that Parker's convictions outside of Texas— if still effective—would deprive him of his voting rights in Texas, is not persuasive authority. Not only was the decision not reviewed by the Texas Supreme Court, but it was rendered in the context of an election dispute, where the real issue was not the impact upon the voter but the impact upon the candidates. Cf. *Logan* v. *United States*, 144 U. S. 263, 303. In any event, even conceding the accuracy of the assumption with respect to Parker's prior convictions and the *Harwell* issue, it is entirely possible that the conviction in this case would operate to augment the punishment should Parker ever again be adjudged guilty of a crime in Texas or in any other State.

Aside from these considerations, however, there is something fundamentally wrong with the theory that mootness should turn upon whether or not a convicted person can run for office or cast a ballot. The principal policy basis for the doctrine of mootness, when that term is employed in the "case or controversy" context, is to insure that the judiciary will have the benefit of deciding legal questions in a truly adversary proceeding in which there is the "impact of actuality," [27] and in which the contentiousness of the parties may be relied upon to bring to light all relevant considerations.[28] Here the

---

[26] See 19 St. John's L. Rev. 185; 59 Yale L. J. 786, 787, n. 3.

[27] Frankfurter, A Note on Advisory Opinions, 37 Harv. L. Rev. 1002, 1006.

[28] See *United States* v. *Johnson*, 319 U. S. 302, 304–305; Bischoff, Status to Challenge Constitutionality, in Supreme Court and Supreme Law (Cahn ed.), 26 *et seq.;* Freund, On Understanding the Supreme Court, 84–86; Note, 103 U. of Pa. L. Rev. 772–773.

issue is surely not abstract. The case comes to us after the actions complained of have occurred, and we have the entire trial record before us. Moreover, George Parker's interest in this litigation is quite substantial enough to insure that his case has been fully presented.[29] Conviction of a felony imposes a *status* upon a person which not only makes him vulnerable to future sanctions through new civil disability statutes, but which also seriously

---

[29] Of opinions expressing a view consistent with the concurring opinion, the Supreme Court of Washington has said, "Those decisions, it seems to us, lose sight of . . . that damaging effect of such a judgment which everybody knows reaches far beyond its satisfaction by payment of a fine or serving a term of imprisonment." *State* v. *Winthrop*, 148 Wash. 526, 534, 269 P. 793, 797. See also *In re Byrnes*, 26 Cal. 2d 824, 161 P. 2d 376; *People* v. *Marks*, 64 Misc. 679, 120 N. Y. Supp. 1106; *Village of Avon* v. *Popa*, 96 Ohio App. 147, 121 N. E. 2d 254; *Roby* v. *State*, 96 Wis. 667, 71 N. W. 1046; Note, 103 U. of Pa. L. Rev. 772, 779–782, 795. But cf. *St. Pierre* v. *United States*, 319 U. S. 41, where the Court held moot on direct appeal the case of a person who had served his sentence for contempt before certiorari was granted. That case is readily distinguishable in view of the factors the Court stressed as relevant. For example, the Court stated that it did not appear "that petitioner could not have brought his case to this Court for review before the expiration of his sentence." Moreover, the Government admitted that petitioner would again be required to testify before a grand jury and that his commitment would again be sought if he refused, so that, as the Court noted, there might very well be "ample opportunity to review such a judgment . . . ." *Id.*, at 43. It seems reasonably clear also that the "collateral consequences" cases have considerably undermined the philosophy of *St. Pierre*. See *Pollard* v. *United States, supra*, at 358; *United States* v. *Morgan*, 346 U. S. 502, 512–513; *Fiswick* v. *United States*, 329 U. S. 211, 220–223. See also *Lafferty* v. *District of Columbia*, 107 U. S. App. D. C. 318, 277 F. 2d 348, where the Court of Appeals for the District of Columbia Circuit set aside a decree of unsoundness of mind after the individual concerned was no longer in a mental institution and was not mentally ill.

Possibly it should be noted, for the sake of completeness, that no one has suggested that the State's interest in upholding the validity of this conviction is insubstantial.

affects his reputation and economic opportunities.[30] And the fact that a man has been convicted before does not make the new conviction inconsequential. There is, after all, such a thing as rehabilitation and reintegration into the life of a community. In this case, for example, none of Parker's previous convictions were in Texas, and he had been out of jail for over five years at the time of the 1954 forgery trial. Five years of law-abiding life in a new community give Parker a significant enough stake in the outcome of this adjudication to preclude a finding of mootness. Furthermore, there is an important public interest involved in declaring the invalidity of a conviction obtained in violation of the Constitution, and, under the Court's decisions, this is a consideration relevant to the mootness question.[31]

In sum, I cannot agree with the Court that George Parker's case comes to us too late. It is too late, much too late, to undo entirely the wrong that has been inflicted upon him; but it is not too late to keep the constitutional balance true. I dissent from the notion that, because we cannot do more, we should do nothing at all.

---

[30] For example, under § 504 of the Labor-Management Reporting and Disclosure Act of 1959, persons who have been convicted of specified crimes are ineligible to serve for a five-year period in various positions for labor unions or employer associations. 73 Stat. 536–537.

For a discussion of the "status degradation ceremony" represented by criminal conviction, see Goldstein, Police Discretion Not to Invoke The Criminal Process: Low-Visibility Decisions in the Administration of Justice, 69 Yale L. J. 543, 590–592. See also Waite, The Prevention of Repeated Crime, 30–31; Frym, The Treatment of Recidivists, 47. J. Crim. L., Criminology & Police Science 1; *United States* v. *Hines*, 256 F. 2d 561, 563.

[31] See *Walling* v. *Reuter Co.*, 321 U. S. 671, 674–675; *Southern Pacific Terminal Co.* v. *Interstate Commerce Comm'n*, 219 U. S. 498, 516; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 309.

Mr. Justice Douglas, with whom The Chief Justice concurs, dissenting.

I do not take the dim view of fictions that the opinion of the Court reflects. Fictions are commonplace to lawyers. In Delaware, prior to its adoption of a modern code of civil procedure, the action of ejectment was based on a series of fictions. The declaration averred a lease to a fictitious lessee, the entry by a fictitious lessee, and the ouster by a fictitious ejector "which when proven or admitted by the consent rule" left "the question of title as the only matter to be determined in the case." 2 Woolley, Practice in Civil Actions (1906), § 1591.

We know from English history how the King's Bench and Exchequer contrived to usurp the Court of Common Pleas—by alleging that the defendant was in custody of the king's marshal or that the plaintiff was the king's debtor and could not pay his debt by reason of the defendant's default. See 3 Reeves' History of the English Law (Finlason ed. 1869), 753.

We are told by Maine, Ancient Law (New ed. 1930), 32, that in old Roman law "fictio" was a term of pleading and signified a false averment which could not be traversed, "such, for example, as an averment that the plaintiff was a Roman citizen, when in truth he was a foreigner."

The list is long, and the case for or against a particular fiction is often hotly contested. See Fuller, Legal Fictions, 25 Ill. L. Rev. 363, 513, 877.

Some fictions worked grievous injustices such as the presupposition that a defendant, though far away, was within the jurisdiction and should be proceeded against by outlawry.[1]  Bentham inveighed against "the pesti-

---

[1] 9 Holdsworth, A History of English Law (3d ed. 1944), 254 et seq. As to corporations, churches, and boroughs see 1 Pollock and Maitland, History of English Law (2d ed. 1899), 486, 669–670.

lential breath of Fiction." [2] Yet fictions were often expedients to further the end of justice.[3] "[T]he purpose of any fiction is to reconcile a specific legal result with some premise." Fuller, *op. cit., supra*, at 514. As Justice Holmes once said, "To say that a ship has committed a tort is merely a shorthand way of saying that

---

[2] 1 Bentham's Works (Bowring ed. 1843), 235.

[3] 9 Holdsworth, *op. cit., supra*, note 1, at 250–251:

"Of all these methods of beginning an action the most common was a *capias ad respondendum*, i. e. a writ directing the sheriff to arrest the defendant. This process was possible in all the most usual personal actions; and, where it was possible, it became the practice, in the course of the eighteenth century, to 'resort to it in the first instance, and to suspend the issuing of the original writ, or even to neglect it altogether, unless its omission should afterwards be objected by the defendant. Thus the usual *practical* mode of commencing a personal action by original writ is to begin by issuing, not an original, but a capias.' As the author of the Pleader's Guide said:—

'Still lest the Suit should be delayed,
And Justice at her Fountain stayed,
A *Capias* is conceived and born
Ere yet th' ORIGINAL is drawn,
To justify the Courts proceedings,
Its Forms, its Processes, and Pleadings,
And thus by ways and means unknown
To all but Heroes of the Gown,
A Victory full oft is won
Ere Battle fairly is begun;
'Tis true, the wisdom of our Laws
Has made Effect precede the Cause,
But let this Solecism pass—
*In fictione aequitas.'*

"But the original was always supposed; and the defendant could always object to its absence, and compel the plaintiff to procure it from the office of the cursitor. It should be noted also that in the procedure by bill against persons actually privileged, or supposed to be privileged, there was necessarily no original. The bill took the place of the original, and also operated as the plaintiff's declaration." And see 2 Bouvier's Law Dictionary (8th ed. 1914), 1213–1214.

you have decided to deal with it as if it had committed one, because some man has committed one in fact." *Tyler* v. *Court of Registration,* 175 Mass. 71, 77, 55 N. E. 812, 814.

We have here an injustice to undo. Parker was convicted in a Texas court of a crime without benefit of counsel; and the nature of the charge, the kind of defense available, and the capabilities of Parker to defend himself, make it plain to all of us, I assume, that due process of law was denied him under the standards laid down in our cases,[4] the most recent one being *Cash* v. *Culver,* 358 U. S. 633. No remedy against this invasion of his constitutional rights was available to him except by *habeas corpus.* While in prison, he followed the federal route. The writ was applied for, the District Court ordered respondent to answer, see *Walker* v. *Johnston,* 312 U. S. 275, 284, and a hearing on affidavits, other documents, and the trial record was held. The petition was dismissed and the Court of Appeals affirmed. 258 F. 2d 937. Then a petition for a writ of certiorari was filed here. More than seven months after his petition for certiorari was filed with us and over three months after we granted certiorari he was released from prison. That was June 6, 1959. So the Court now rules that he has no relief by way of *habeas corpus* because the illegal detention he challenged has been terminated. And so it has. But his controversy with the State of Texas has not ended. The unconstitutional judgment rendered against him has a continuing effect because under Texas law "[a]ll persons convicted of any felony except those restored to full citizenship and right of suffrage or pardoned" are disqualified from voting. Texas Election Code, Art. 5.01. The loss of these civil rights prevents a case from becoming

---

[4] And see the dissenting opinion of Judge Rives below, 258 F. 2d 937, 941–944.

moot, even though the sentence has been satisfied.[5] *Fiswick* v. *United States,* 329 U. S. 211, 222; *Pollard* v. *United States,* 352 U. S. 354, 358. The controversy that Parker has with Texas is a continuing one.

If this were a federal conviction, Parker would have a remedy under 28 U. S. C. § 2255. See *Pollard* v. *United States, supra.* But we were advised on oral argument that Texas provides no such remedy and that Parker has no known method of removing the civil disabilities that follow from the unconstitutional judgment of conviction. He may be pardoned. But pardons are matters of grace. There is no remedy which he can claim as a matter of right, unless it is this one. I cannot therefore be party to turning him from this Court empty-handed.

Any judgment *nunc pro tunc* indulges in a fiction. But it is a useful one, advancing the ends of justice. A man who claims to be unlawfully in the custody of X is not required to start all over again if X has died and Y has been substituted in X's place. We treat the *habeas corpus* petition as the facts were when the issue was drawn and enter judgment *nunc pro tunc* "as of that day." *Quon Quon Poy* v. *Johnson,* 273 U. S. 352, 359. The same is done when other parties die before final decision. See *Mitchell* v. *Overman,* 103 U. S. 62; *Harris* v. *Commissioner,* 340 U. S. 106, 112–113. These cases can all be distinguished from the present one. But the principle

---

[5] The fact that there are other felony convictions which would be unaffected by our action seems to me to be immaterial. Petitioner is entitled here and now to start untangling the skein. If we grant relief, we will have undone the wrong which our own delay made possible. We have no way of knowing what other measures may be available to relieve petitioner of the stigma of the other felonies. Only if we were certain (as we are not) that there are or will be none could we fail to give him relief against the wrong done here by the processes of the law.

is deep in our jurisprudence and was stated long ago in *Mitchell* v. *Overman, supra,* pp. 64–65, as follows:

"[T]he rule established by the general concurrence of the American and English courts is, that where the delay in rendering a judgment or a decree arises from the act of the court, that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, either the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties, the judgment or the decree may be entered retrospectively, as of a time when it should or might have been entered up. In such cases, upon the maxim *actus curiae neminem gravabit,*—which has been well said to be founded in right and good sense, and to afford a safe and certain guide for the administration of justice,— it is the duty of the court to see that the parties shall not suffer by the delay. A *nunc pro tunc* order should be granted or refused, as justice may require in view of the circumstances of the particular case."

It is the fault of the courts, not Parker's fault, that final adjudication in this case was delayed until after he had served his sentence. Justice demands that he be given the relief he deserves. Since the custody requirement, if any, was satisfied when we took jurisdiction of the case, I would grant the relief as of that date.