Gary H. HOLMES, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 20042.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 16, 1966.

Decided Jan. 18, 1967.

Supplemental Opinion May 11, 1967.

Mr. Gerald G. Schulsinger, Washington, D. C., with whom Mr. Robert N. Duggan, Washington, D. C. (both appointed by this court), was on the brief, for appellant.

Mr. Edward T. Miller, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and David N. Ellenhorn, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and BURGER and LEVENTHAL, Circuit Judges.

BAZELON, Chief Judge:

Arrested in the early morning hours of September 14, 1965, appellant was charged with grand larceny and destruction of private property. Following a preliminary hearing, appellant was held for action of the grand jury. Although pre-trial bail was set, appellant remained in custody because he could not afford the premium on a bail bond. An indictment was returned and appellant stood trial on January 3, 1966. The jury acquitted him on the larceny charge, but found him guilty of destroying private property, a misdemeanor. 22 D.C.Code § 3112 (1961), now 22 D.C.Code § 403 (Supp. V, 1966). On February 11, 1966, the district judge imposed the maximum six month sentence, and subsequently denied a motion to credit pre-trial custody against the sentence. Leave to appeal *in forma pauperis* was granted on March 7, 1966 and the trial transcript was ordered prepared at Government expense.

In accordance with our usual practice, we appointed counsel to represent appellant and provided that the time for filing appellant's brief would not commence to run until the trial transcript had been docketed as a supplemental record. Thereafter, a frustrating series of delays was encountered,[1] and the transcript was not docketed until July 8th. On July 11th, appellant was released from jail having served his sentence.

██ We think it clear, and the Government does not argue otherwise, that appellant had a statutory right to a trial transcript, 28 U.S.C. § 1915, and that such right necessarily included reasonably prompt receipt of the transcript in order that prosecution of the appeal for which it is furnished would not be thwarted. The Supreme Court has recognized the essential nature of the transcript. Hardy v. United States, 375 U.S. 277, 282, 84 S.Ct. 424, 11 L.Ed.2d

[1]. The trial reporter originally estimated that the transcript would be completed about April 14th. On May 3rd, in response to a complaint from counsel, our Clerk wrote the reporter, pointing out that appellant was in custody, and urged prompt preparation of the transcript. The reporter assured the Clerk that the transcript would be ready by May 16th. On May 19th, counsel again complained of the delay in preparing the transcript and at our direction the Clerk again wrote to the reporter. On June 25th, the transcript still not prepared, counsel filed a motion seeking reversal on the ground that the reporter's tardiness had infringed appellant's right to a speedy disposition of his appeal. The Government's opposition to this motion was filed on July 6th; appellant's reply on July 8th. Thereafter, we held that motion in abeyance pending argument of this case on the merits.

331 (1964), which Mr. Justice Goldberg called "the most basic and fundamental tool of [the] profession * * *." 375 U.S. at 288, 84 S.Ct. at 431 (concurring opinion). Delay in the preparation of transcripts is a problem we face with disturbing frequency.[2] We know from our discussions with district judges that there is a serious shortage of reporters and that they now labor under unusually heavy workloads. We are also advised that the District Court has recently added temporary reporters in an effort to ease the mounting backlog of transcripts which have been ordered but not prepared. The record does not show why this particular transcript was delayed, nor do we think it necessary to search for the cause. More than likely, delay in preparation of transcripts is an amalgam of many factors. But where we deal with a statutory right, even the most plausible of reasons cannot serve to excuse outright denial of that right. It is only because of a jurisdictional objection interposed by the Government, to which we now turn, that we find it unnecessary to decide today whether reversal is the proper remedy for unreasonably delayed transcripts,[3] or whether some other form of relief is appropriate.[4]

 Citing St. Pierre v. United States, 319 U.S. 41, 63 S.Ct. 910, 87 L. Ed. 1199 (1943), the Government contends that appellant's unconditional re-

lease renders the case moot. Although *St. Pierre* so holds, later cases have made it clear that a matter remains justiciable, even though the sentence has been served, if there is some collateral disadvantage which the party might reasonably be expected to incur by virtue of the conviction.[5] We were unwilling to decide this issue on the scant data in the record and called for supplemental memoranda from the parties. The Government lists fourteen misdemeanor convictions which appellant has incurred in this jurisdiction since November, 1961, including a previous conviction for this identical offense. Appellant does not challenge the accuracy of the Government's representation in this regard. In these circumstances, we find no collateral disadvantage which appellant might incur by virtue of this, his fifteenth misdemeanor conviction. Accordingly, we consider *St. Pierre* controlling, and hold that this case is moot.

This is not a result we comfortably reach for the record indicates that this appeal became moot simply because appellant lacked the funds to post a nominal appeal bond[6] or to purchase a trial transcript. But the Supreme Court cases, resting as they do on jurisdictional grounds, seem to us to preclude an exception under the circumstances of this case. What we said in another context is apt here. "We are getting better at

---

2. See REPORT OF THE PRESIDENT'S COMMISSION ON CRIME IN THE DISTRICT OF COLUMBIA 305–308 (1966).

3. *Cf.* Whitt v. United States, 104 U.S.App. D.C. 1, 5, 259 F.2d 158, 162 (1958), cert. denied, 359 U.S. 937, 79 S.Ct. 652, 3 L. Ed.2d 637 (1959).

4. *Cf.* United States v. Metzger, 133 F.2d 82 (9th Cir. 1943). Nor is it necessary to consider whether delay in preparation of the transcript would have speedy trial implications if reversal and a retrial were to follow in a given case. Manning v. United States, 125 U.S.App.D.C. 256, 371 F.2d 353 (1966).

5. *E.g.*, Parker v. Ellis, 362 U.S. 574, 80 S. Ct. 909, 4 L.Ed.2d 963 (1960); Pollard v. United States, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957); United States v. Morgan, 346 U.S. 502, 512–513, 74 S.

Ct. 247, 98 L.Ed. 248 (1954); Fiswick v. United States, 329 U.S. 211, 220–222, 67 S.Ct. 224, 91 L.Ed. 196 (1946); Wetzel v. Ohio, 371 U.S. 62, 83 S.Ct. 111, 9 L. Ed.2d 26 (1962) (Douglas, J., concurring); Parker v. Ellis, *supra*, at 577, 80 S.Ct. at 911 (Warren, C. J., dissenting); Dancy v. United States, 124 U.S.App. D.C. 58, 361 F.2d 75, 79–80 (1966).

6. The district court originally set appeal bond at $1,000. A motion to reduce was granted and bail was reset at $500. Appellant was unable to find a bondsman willing to write even such a nominal bond. No application for release on personal bond or recognizance was made in this court, nor was a motion to stay judgment pending appeal presented. See St. Pierre v. United States, supra at 43, 63 S.Ct. 910.

supplying legal aid to the poor. We are, it is true, gradually eliminating the disparities between the ideals and the realities of our system of justice. But the situation is far from tolerable." Powell v. Zuckert, 125 U.S.App.D.C. 55, 58, 366 F.2d 634, 637 (1966).

Dismissed.

BURGER, Circuit Judge, concurs in the result.

## SUPPLEMENTAL OPINIONS

### PER CURIAM:

The opinion of this court rendered January 18, 1967, dismissed for lack of jurisdiction, but called attention to the injustice of a situation where an accused cannot get his appeal considered on the merits because he served his sentence before a transcript was prepared. We did not seek in that opinion to identify the causes of delay, but instead referred to them as an amalgam of many factors.

We had not supposed it would become the province of an opinion to deal in more detail with what is essentially an administrative problem. We have done so in this supplemental opinion in order to provide perspective for the apparently simple solution developed in the opinion which our concurring colleague prepared after January 18, 1967, and which isolates one of these factors for extended discussion.

It is apparently suggested that the problem of transcript delay could be substantially solved by changing our practice so that in general trial counsel will be appointed for appellate presentation. ▬ We believe that it is entirely appropriate to propose for discussion by the Judicial Council and Judicial Conference, including the Committees thereof, whether and in what situation appellate counsel should be the same as trial counsel. However, it seems to us that this is a matter that should be decided in terms of fundamentals of the administration of justice, and that for this purpose the courts should be able to take for granted the capability of reporters to furnish transcripts with reasonable promptness.

### I

The problem of transcript delay is essentially an administrative problem that has swollen as an incident of the rapid increase in the number of criminal appeals filed in our court. The 1966 report of the Presidential Commission generally referred to as the D. C. Crime Commission was concerned with the problem and recommended that the courts focus on the adequacy of the reporting staff. The data in the Commission's report show a dramatic surge in criminal appeals beginning in fiscal 1963.[1] For fiscal years 1952–62, criminal appeals ranged in number from 71 to 136, with a median of 97 and an average of 101. In the four fiscal years 1963–1966, criminal appeals numbered: 200; 251; 237; and 252. The Commission noted that this in part reflected an increase in the percentage of convicted defendants taking appeals, and stated: "The rapid increase in recent years is probably attributable in part to recent judicial decisions which have made appeals by indigent persons more widely possible." (REPORT at 301). Its Report cited, of course, the Supreme Court's decisions in *Hardy, Coppedge* and *Ellis*.[2]

It should be noted that the recent trend in our circuit approximately parallels the overall national trend for the eleven courts of appeals. The national data show that in the earlier period criminal appeals averaged about 600, ranging from 308 to 731, but that in the last four fiscal years criminal appeals have numbered: 985, 1188, 1305, and 1262.

---

1. See REPORT OF THE PRESIDENT'S COMMISSION ON CRIME IN THE DISTRICT OF COLUMBIA 303 (1966) (hereafter REPORT).

2. See REPORT at 958 nn. 177 & 196, citing Hardy v. United States, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964); Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962); Ellis v. United States, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed.2d 1060 (1958).

As to the specific problem of transcript delay and the consequent delay in disposition of criminal appeals, the D. C. Crime Commission recommended that this court and the District Court establish a joint committee "to investigate and ensure the adequacy of the court reporting staff." [3] The Judicial Council has discussed the problems several times with Chief Judge Curran of the District Court, accompanied on one occasion by another District Judge.

The administrative problem of transcript delay primarily requires consideration of the practices and compensation of the court reporters, matters now under consideration by the District Court. Reforms and improvements have been achieved; others are in prospect. Chief Judge Curran has designated himself as Liaison Judge with the Court Reporters, and has recently issued Rules for Court Reporters that establish a number of pertinent administrative requirements. A system for rotation of duty has been established—a matter that may well be of prime significance since analysis of data available to the Judicial Council shows that only four out of twenty reporters are responsible for significant transcript delay (over 1,000 pages) and that they account for more than 60% of the backlog of some 12,000 pages as of the end of March. Even prior to the institution of this reform backlog was cut by a not inconsiderable 7% in February, and by the end of March the new system contributed to a reduction in transcript backlog from over 16,000 pages to fewer than 12,000, an inroad of over 25% in one month.

## II

The revamping of the administrative approach to the reporter problem should obviously be continued whatever is done about the suggestion of our concurring colleague that the court stress continuance of trial counsel. Reverting to that suggestion we think, as already indicated, that the problem involves issues of judicial administration of more significance than, though not excluding, transcript delay. Assuming that retention of trial counsel might trim the transcripts ordered from reporters, a curtailment that we think will be far more modest than our concurring colleague visualizes, this administrative benefit must be weighed alongside the substantial benefits inhering in assignment of new counsel for the appeal. Full and ripe discussion of the interrelated policy and administrative considerations should embrace the following inquiries, among others.

1. Would retention of trial counsel materially reduce the requests for trial transcripts?

It is a mistake to suppose that a request for full transcript emanates from unfamiliarity with the trial, or from the attitude that the transcript might as well be ordered when it is "free." Exactly the contrary is the thrust of Justice Goldberg's opinion in Hardy v. United States, 375 U.S. 277, 288, 84 S.Ct. 424, 431 (1964), that "no responsible retained lawyer who represents a defendant at trial will rely exclusively on his memory (even as supplemented by trial notes) in composing a list of possible trial errors which delimit his appeal. Nor should this be required of an appointed lawyer." 375 U.S. at 288, 84 S.Ct. at 431 (concurring opinion). Justice Goldberg was joined by Chief Justice Warren and Justices Brennan and Stewart.[4] The other three justices who joined in the

---

3. REPORT at 308.

4. While criminal cases are obviously not of equal length, there is little reason to believe that differences in trial time bear significantly on the transcript problem.

 In both long and short trials the natural tendency of counsel is to order the full transcript unless there is positive reason for specifying omissions. In the longer trial pruning the transcript may save some money, but there is a greater risk of overlooking the significance of trial developments. In the short trial, the small saving in transcript cost is not likely to be considered worth the trouble.

 Of course very different "pruning" considerations are applicable to the issue as to what portions of the transcript need to be printed or xeroxed for the Joint Appendix.

opinion of the Court did not disagree with this statement, but found it unnecessary to consider the matter. Justice Clark was alone in advocating a requirement that trial counsel be retained for the appeal. Congress did not accept his suggestion that such a provision be inserted in the Criminal Justice Act.

Our own files reinforce the conclusion that continuance of trial counsel will not result in a material transcript saving.[5] Our records enable us to locate quickly the 17-odd cases in the current term and prior term where trial counsel was designated for the appeal by the District Court, and we find that the testimony was invariably transcribed in full and in only half the cases does the order for transcription issued by the District Judge exclude even summations and voir dire examinations.[6] Arraignment, plea and sentencing have been routinely transcribed in all cases.[7]

2. Is continuance of trial counsel a fair and efficient use of available legal manpower?

One subsidiary question is whether it is appropriate to induce further effort at this time from trial counsel who has already given time that we realistically know is not compensated by the modest sums available under the Criminal Justice Act. As the D. C. Crime Commission has put it, this representation by private lawyers "remains a substantial public service." [8] If the matter is left to the option of trial counsel it may develop that the better and busier trial counsel will ask to be excused while the others remain.

More significant are these core facts: We have a shortage of legal manpower experienced in criminal law. (Hopefully the supply is being augmented by recent changes in the curriculum and emphasis of the law schools in the District.) And even the pool of effective trial counsel in general practice is somewhat limited.

However there is a substantial number of lawyers located in the nation's capital who handle matters before agencies of Government and possess appellate background and experience.

At least as a general rule, it would seem meritorious to devote the scarcer commodity, experienced trial counsel, to the trial function, and to draw for the appeal on the larger pool of lawyers accustomed to briefing and oral argument on points of law.

Furthermore, Washington attorneys specializing in practice before Federal agencies and departments typically have clients located elsewhere throughout the nation for the most part, and they are more likely to be out of town for substantial time periods. It is obvious that lawyers with such schedules are better able to discharge appointments at the appellate level than at the trial level where there is a need for timely investigation and pursuit of evidence.

3. Still more fundamental is this question, is there a significant benefit to the court in having the insight of fresh appellate counsel?

We are in general appreciative of the insights provided by the Assistant United States Attorneys appearing be-

---

5. We do not suggest that appellate counsel should routinely order transcription of the voir dire when no reason therefor is suggested in the conference held with trial counsel to become familiar with the nature of the case.

6. The file numbers are Nos. 19114, 19287, 19326, 19327, 19497, 19599, 19620, 19672, 19762, 19883, 19895, 19909, 19964, 20037, 20108, 20268, and 20322.
We doubt that there would be a difference in result if we were to undertake the special study required to identify the cases where this court has appointed trial

counsel to handle the appeal. (Incidentally, this court has on occasion made such an appointment even where the counsel at trial was a member of the staff of the Legal Aid Agency. *E.g.,* Nos. 19241, 19642, 19978.)

7. See 28 U.S.C. § 753(b) (Supp. II, 1966). It is possible that a reduction in transcripts can be achieved by greater reliance on electronic recordings, but that is of course a separate and not simple inquiry.

8. REPORT at 343.

fore us, attorneys who almost invariably are brought in at the appellate stage.

Although in recommending increased use of public defender counsel the D.C. Crime Commission cited the advantage of continuity in representation at both preliminary hearing and at trial, it took specific note that the continuity principle should not require that trial counsel be used for appeal. "[T]he advantages of the new perspective brought by the appellate advocate sometimes outweigh those of familiarity with the pretrial and trial proceedings." [9]

The significance of the fresh-look aspect of new appellate counsel is even greater when trial counsel are not specialists in criminal law, as the Crime Commission presupposed in its recommendation of professional public defenders. Out of necessity the counsel appointed to represent indigents at the trial include lawyers who, although they have general trial experience, frequently do not have the kind of background in criminal law and procedure possessed by those lawyers who are retained for criminal cases. There may well be a substantial and critical time lag before they become aware of decisions that have become the common coin of those specializing in the field.[10]

■ The need to appoint counsel less experienced or inexperienced in criminal law, while not of itself negativing the effective assistance of counsel guaranteed by the Constitution, underscores the benefit of a fresh look to assist the court in its basic inquiry, whether justice has been done.

We understand that in some cases, at least, counsel appointed for the trial affirmatively welcome the appointment of new counsel for the appeal so that there may be a fresh look where liberty turns on their performance in an area where they claim no expertise.

Ultimately, perhaps, the system should be changed or adapted so as to assure heightened expertise from the start. In the meantime, however, problems inherent in the current stage of the system of assigned counsel are at least ameliorated by the assignment of new counsel on appeal.

4. Is the court aided in its disposition if it has available a full trial transcript?

■ Not infrequently appellant contends that the judgment is not supported by the evidence, and in that case he is required to print "all material portions of the testimony and evidence." D.C.Cir. Rule 16(a).[11]

■ However other errors which on their face do not relate to the evidence are appraised by the court in the light of the evidence. They cannot be judged in a vacuum. A charge must conform to the evidence adduced,[12] alleged errors in the receipt or exclusion of evidence must be assessed in factual context,[13] and error which might be prejudicial in a close case does not call for reversal in a strong

9. REPORT at 346.

10. This was dramatically illustrated by a recent statement on argument by a generally competent counsel, appointed for a criminal appeal, that he had never heard of the landmark *Luck* case which permits trial courts to exercise discretion in allowing defendants to testify without fear of impeachment by reference to prior criminal convictions. Luck v. United States, 121 U.S.App.D.C. 151, 348 F. 2d 763 (1965). Counsel had not come across the case because it was not yet in the D.C. Digest. Requests invoking the *Luck* rule are frequently made by attorneys specializing in criminal practice.

11. An appellate court may not entertain this issue without a transcript of all the evidence. *E. g.*, Strangway v. United States, 312 F.2d 283 (9th Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L. Ed.2d 199 (1963).

12. *See, e.g.*, Harris v. United States, 118 U.S.App.D.C. 21, 331 F.2d 95 (1963); Johnson v. United States, 115 U.S.App. D.C. 63, 317 F.2d 127 (1963); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (en banc).

13. *E.g.*, Hardy v. United States, 118 U.S. App.D.C. 253, 335 F.2d 288 (1964).

one.[14] These considerations, which also apply to consideration of prejudice from summation, and which must be coupled with our obligation to notice plain error whether or not raised,[15] indicate the benefit that inures to the court as well as to counsel from a complete transcript.

5. Is there a problem of denying the indigents the same access to appellate review as the rich? [16]

■ The fundamental principle, announced in Griffin v. Illinois, 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956) (opinion of Black, J.), that "[d]estitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcrips" has undeniable vitality. See Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961); Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963); and Long v. District Court, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966). The latest in this unbroken string is the Court's decision three days ago in Anders v. State of California, No. 98, October Term 1966, 87 S.Ct. 1396. And the companion case to *Anders*, Entsminger v. State of Iowa, No. 252, October Term 1966, 87 S.Ct. 1402, although not necessarily ruling squarely on the point, certainly reflected stern disapproval of a procedure whereby trial counsel elected to have the case presented to an appellate court on less than the full record, at least in the absence of notice to the indigent appellant.

In the last analysis, the problem is one of perspective. Our sense of proportion suggests that the capability of providing full transcripts, in an appropriate administrative setting, is not so demanding of the resources of court personnel as to require the courts to take steps that may hamper relief from prejudice and withhold assistance to the court.

There may well be merit in appointment of trial counsel to handle the appeal in more cases—even though for reasons already noted we do not think this would or should substantially reduce trial transcripts. The matter merits consideration upon evaluation of the pro's and con's in the general administration of criminal justice—not excluding but certainly not limited to the mechanical question of trial transcripts. Consideration should be on the primary issues and merits, and not on relatively tangential aspects.

BURGER, Circuit Judge (concurring in the disposition):

There is no doubt that the great increase in criminal trials and appeals has helped to create a critical problem in the delay of the preparation of transcripts. At the end of January, there were approximately 17,000 pages of transcript ordered but not supplied because of the reporters' press of work. Because of discussion of the reporter crisis in the majority opinion filed January 18 and because of the failure of the Judicial Council to deal with the problem administratively, I feel constrained to point out that a major, if not the decisive, cause is a factor that lies largely within the control of this court and ought to be remedied by us. In short, the reporter crisis is largely a self-inflicted wound arising out of our practice of appointing new counsel for virtually every appeal by an indigent rather than continuing the trial counsel who is familiar with all

14. *E.g.*, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Cross v. United States, 122 U.S.App.D.C. 283, 285, 353 F.2d 454, 456 (1965); Jones v. United States, 119 U.S.App.D.C. 213, 214 n. 3, 338 F.2d 553, 554 n. 3 (1964).

15. *E.g.*, King v. United States, 125 U.S. App.D.C. 318, 372 F.2d 383 (1966); Goforth v. United States, 106 U.S.App.D.C. 111, 269 F.2d 778 (1959).

16. We think it may be fairly assumed that those with resources will have the benefit on appeal of a complete transcript. Exceptions may well be tactical. For example, in Laughlin and Forte v. United States, Nos. 19562, 19563, the Government designated the portions of the transcript omitted by appellants.

facts and issues in the case. Trial counsel should continue in the case in a large proportion of cases.

Since this discussion began, five court reporters have been added on a temporary basis to meet the emergency situation, and this very likely explains the improvement which the Per Curiam notes. If these reporters become a permanent addition, the added permanent cost would be almost $50,000 per year; this would represent the reporters' base salary, but not other expenses of their operation.

The point I wish to make is that this added expense is to a large extent wasteful and unnecessary. The problem can be vastly improved even if not totally solved in a more efficient manner and on a more long-range basis by appointing trial counsel to handle a substantial number of appeals. I am gratified that my proposal has finally, after much delay, brought forth a recognition by my colleagues that the Council has an obligation to deal with this matter. The proposal to use trial counsel has received no attention from the Court except as it has been surfaced in this case.[1]

Private litigants who lose cases in the District Court sometimes, but not always, take appeals to this Court. Before they do so they make a sober appraisal of their prospects of success on appeal and the probable costs. Unless the prospects seem reasonably encouraging the private litigant usually decides not to put "good money after bad" and accepts the trial outcome. And when the private litigant takes an appeal he does not ordinarily need a complete transcript of the record since, except in a lengthy trial, the recollection and trial notes of the lawyer serve most of the need.

But this is not done with the criminal cases of indigent defendants. The government furnishes a lawyer, as it should, to assist him in his defense. If there is a guilty verdict, as there is in most cases as a matter of statistical fact, the government also gives him a free appeal. At this stage the Court appoints a *different* lawyer to prepare and argue the appeal.[2]

The new lawyer must then try to learn all that went on before, and the best source is a verbatim transcript of the trial, preparation of which is often extensive in time and expensive in cost. The private litigant does not engage in the expensive luxury of a new lawyer on appeal or if he does so in a rare case his trial counsel remains available to tell the new lawyer what went on at trial thus reducing if not eliminating the need for a transcript.

The lawyer newly assigned by us for appeal is put to the test; in a sense, he is challenged to unearth some error. Because someone else has tried and lost, the new lawyer must gain a victory if he is to satisfy the indigent defendant, and if on appeal he fails to raise every conceivable point—no matter how frivolous—the indigent, if he loses, will likely embark on a campaign of attack on his counsel. A large number of baseless postconviction attacks on lawyers point up this possibility.

Surely the appeal lawyer thus put to the test and aware of the hazards of future attack from convicted prisoners cannot be blamed for wanting all the tools necessary for handling an appeal in a case which he did not try. A transcript is the basic tool in these circumstances, even though all of it may not be necessary

---

1. I heartily agree with the observation of my colleagues that it is hardly "the province of an opinion to deal * * * with what is essentially an administrative problem", but on this administrative problem the administrators have not yet administered. Perhaps this dialogue will prompt some constructive action by the Court.

2. This practice is not an inadvertence on our part. Prior to 1962, District Judges appointed counsel on appeal. On October 12, 1962, by an Order of the Circuit Judicial Council, we indicated our willingness, on an experimental basis, to appoint counsel to represent appellants allowed to appeal in forma pauperis. Although this Order did not preclude the District Court from continuing to appoint counsel, its practical effect resulted in this court making all appointments.

in every case. By this program the appeal can become more expensive than the trial and indeed far more expensive a process than most private litigants can afford. The indigent need not consider the cost factor as the private litigant must; the lawyer appointed on appeal is doing simply what we ask of him.

I would not go so far as to say that trial counsel should conduct the appeal in every case but it seems obvious that there are numerous advantages, of which cost is not a decisive one, in continuity of representation in the great majority of cases. Continuity as the general practice would eliminate a large part of the problem of delay in transcripts and duplicated work of counsel, each of whom must be paid.[3]

All this is compounded by the hard fact that fewer and fewer accused persons are willing to plead guilty; they prefer to go to trial, on the theory, however dubious, that they have nothing to lose. Whether providing defense facilities at public expense is the reason for this recent decrease in guilty pleas or whether accused persons have some vague notion that everything is "going their way" because of our legitimate concern for defendants, I am unable to say. But the realistic fact is that a large number of cases which ought to be disposed of by guilty pleas—for the best interests of the accused—are being tried, and the automatic free appeal under Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962), then floods court reporters with demands for thousands of pages of verbatim transcripts with which they are not able to cope.[4] In the fiscal year 1966, 272 convictions were followed by 252 appeals, most of which were at public expense, REPORT OF THE PRESIDENT'S COMMISSION ON CRIME IN THE DISTRICT OF COLUMBIA 303 (1966).

I do not suggest that retaining the trial lawyer on appeal would eliminate all need for complete transcripts, nor do I suggest that it be done automatically in every appeal. I do suggest it is a fallacy to treat all criminal trials as the same kind of "animal"; some are long, some short, some are simple, some complicated. The need for a full transcript in a one or two day trial is very different from that in an extended trial, and the majority of criminal cases in this jurisdiction are tried in two days or less. With deference to the concurring utterances of Justice Goldberg in Hardy v. United States, 375 U.S. 277, 288, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964), I submit that a competent lawyer who has tried a short, simple case does not ordinarily need a full transcript; he can do without a full transcript unless his appeal rests on insufficiency of the evidence and even then he does not need the voir dire examination, closing arguments, or the instructions, which often amount to half the transcript.

Judges Bazelon and Leventhal suggest that appointing trial counsel to the appeal will not reduce the demand for transcripts since full transcripts were ordered in all the recent cases where appoint-

---

3. The President's Commission on Crime in the District of Columbia made this same point and suggested that continuity could best be accomplished—and duplication of work avoided—by an expanded public defender program. REPORT OF THE PRESIDENT'S COMMISSION ON CRIME IN THE DISTRICT OF COLUMBIA 346 (1966). The current "public defender," the Legal Aid Agency, generally does not represent defendants on appeal in our court since it interprets its statutory power to preclude representation in this court. See D.C.Code § 2–2202.

Experience to date suggests that in large metropolitan centers representation of indigents can be most efficiently and economically supplied by a full time specially trained legal aid staff.

4. This Circuit because of its unique jurisdiction over D.C.Code crimes has a greater problem than any other Federal Circuit. Presently some court reporters are unable to prepare transcripts for periods of six months and more after an appeal is taken. A court reporter cannot cover a trial on a daily basis and prepare transcripts of earlier trials at the volume at which such transcript requests are currently made.

ed trial counsel did argue the appeal. What this overlooks is that at the present time it is *automatic* for an appointed counsel to ask for a full transcript because we have casually allowed it without reference to need; no lawyer worth his salt needs the *complete* transcript on appeal *for a case which he tried in two days or less.* Since *new* counsel appointed on appeal require and receive full transcripts, such a demand seems to have become a matter of course for *all* counsel. If court-appointed counsel are casually demanding full transcripts simply because the transcript is "free," this is a matter which surely should have long since engaged the attention of a court concerned with sound judicial administration and reasonable allocation of public resources. These transcripts are "free" only in the sense that they are supplied at public expense.

My colleagues contend that appointing new lawyers on appeal effects a more equitable division of the burden among lawyers than would continuing the trial lawyers on appeal. But I fail to see how appointing a trial lawyer to conduct the appeal would place any greater burden on him than does the present arrangement. A lawyer handling both trial and appeal should receive roughly half as many appointments. Moreover, he would be required to spend less time on *two* stages of *one* case than if he had to familiarize himself with two different cases at either stage.

My colleagues urge another ground for appointing new counsel on appeal. New counsel, they say, view the case with a "fresh eye"; perhaps this is a euphemism for saying they embark on a quest for error at the risk of being charged with ineffective performance if they do not find it. But in applying the decisional and statutory laws relating to indigents, perhaps we should ask whether Congress and the Supreme Court intended that the public should pay the additional costs required for new counsel to gain a "fresh approach" when this rarely occurs for the accused person who pays his own way. Moreover, the "fresh approach" often delays the appeal while the new lawyer waits for the transcript and then studies it. Balancing the chance that a change of counsel might benefit a particular appellant against the obvious waste involved in needless transcripts, delays in the proceedings, and duplication of legal work and cost, I would make the choice for retaining trial counsel on appeal in most cases, provided the District Judge certifies in some way that counsel is competent.

It is also suggested that a full transcript is needed to aid this court; this is simply not so as to the great majority of our cases. A full transcript is rarely required except on a genuine claim of insufficient evidence; the parties surely can agree on a statement of the evidence presented in short trials, using a transcript only for disputed and crucial testimony. Even on a claim of insufficient evidence we do not need the transcript of examination on voir dire, the closing arguments of counsel, or the Court's charge. The only "aid" I can see is that providing the court with a full transcript in every case enables judges of this court to comb through it to find some error which has thus far eluded all others. But I submit that this court's delegated function is not to act as a third appointed counsel and I question whether Congress intended or will support such a system.

In 1966 indigents were provided with almost 65,000 pages of transcript at public expense, the cost being nearly one dollar per page. The current "crisis" arises from the fact that in January 1967, when the majority opinion was released, reporters were about 17,000 pages "behind" and appeals were delayed as a result. It is a matter of simple arithmetic that the elimination of about 25% in indigents' demand for transcripts by reasonable supervision from this court would solve the problem, *i. e.,* 25% of the 65,000 page total represents roughly the 17,000 pages of "delay." I submit that far more than 25% of the present demand for transcripts is readily avoidable and therefore fairly warrants character-

izing our current problem as a self-inflicted wound.

Sooner or later perhaps there will be an awakening that these thousands of pounds of blue-covered transcripts prepared at large cost in many cases which are totally without merit on appeal might better be spent on the more significant aspects of the administration of justice such as preventive programs, better prisons, and improved rehabilitation treatment. The unfortunate man in the dock is not always best served by courtroom conflict and multiple appeals which prolong his warfare with society, sometimes for years, and erode whatever potential may exist for rehabilitation.

Bench and bar alike need to make a sober re-examination of what we are doing and consider whether it really serves society or its delinquents to become so obsessed with the techniques of judicial machinery that we forget the purposes of a system of justice.