**Marion F. MIDDLETON, Plaintiff,**

v.

**DAN RIVER, INC., Defendant.**

**Eunice McCOY, Plaintiff,**

v.

**DAN RIVER, INC., Defendant.**

**Clifton SMITH, Plaintiff,**

v.

**DAN RIVER, INC., Defendant.**

**Lonnie HILLIARD, Plaintiff,**

v.

**DAN RIVER, INC., Defendant.**

**Zack SCHOFIELD, Plaintiff,**

v.

**DAN RIVER, INC., Defendant.**

Civ. A. Nos. 83–T–1129–N, 83–T–1160–N, 83–T–1183–N, 83–T–1419–N and 84–T–007–N.

United States District Court, M.D. Alabama, N.D.

Aug. 15, 1985.

Rick Harris, Stephen R. Glassroth, L. Gilbert Kendrick, John B. Bush, Moore, Kendrick, Glassroth, Harris, Bush & White, Montgomery, Ala., for plaintiffs.

Richard A. Ball, Jr., C. Winston Sheehan, Jr., Ball, Ball, Duke & Matthews, Montgomery, Ala., Scott M. Phelps, Warren Lightfoot, Bradley, Arant, Rose & White, Birmingham, Ala., Michael Patrick Regan, Associate Gen. Counsel, Dan River, Inc., Law Dept., Danville, Va., for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

These consolidated causes are claims for workers' compensation benefits under Alabama law. The court has diversity jurisdiction over these claims pursuant to 28 U.S.C.A. § 1332. Based on the evidence presented at a nonjury trial, the court finds that these claims are due to be granted and benefits awarded. The court also considers and grants one of the plaintiffs' counsel's motion for the court to enter judgment nunc pro tunc.

### I.

Plaintiffs Marion F. Middleton, Lonnie Hilliard, Zack Schofield, Eunice McCoy, and Clifton Smith, all former cotton textile workers, have brought these lawsuits pursuant to 1975 Ala.Code §§ 25–5–1 through 25–5–231 against Dan River Mills, Inc., their former employer. From 1955 until 1982, Dan River operated a cotton textile mill in Greenville, Alabama. Built around 1928, the mill first belonged to Alabama Mills, Inc., from whom Dan River acquired it. The plaintiff cotton workers worked in this mill for periods varying from fifteen to fifty-one years, beginning in one instance at the age of fourteen and in others at the age of sixteen; some were employed at the mill all their working lives. Only one finished high school; the others can write only their names and cannot read.

Throughout their years at the mill, the cotton workers seldom changed jobs. One worked mostly in the card room, two in the spinning room, and two in the weave room. While one worked for some time as a shift supervisor, the others stayed in manual positions. When their employment ended, the cotton workers earned between four and seven dollars an hour. In late 1982, Dan River closed the mill due to decreased demand for the corduroy cloth it produced.

The cotton workers all claim that they suffer lung disease caused by their employment at Dan River's Greenville mill. The issue for the court is whether the cotton workers have disabilities compensable under Alabama's workers' compensation law. The court must also determine whether four of the cotton workers may maintain their claims within the statute of limitations.

### II.

Alabama's courts have repeatedly stated, as recently expressed, that "[t]he workmen's compensation laws are remedial in nature and are to be liberally construed and applied in order to effect their beneficent purposes." *Hilyard Drilling Co., Inc. v. Janes*, 462 So.2d 942, 943 (Ala.Civ. App.1985). "An employee covered under the workmen's compensation law is entitled to be fully compensated for his job-related injury, and provisions of the law should be liberally construed to accomplish that result.... All doubts regarding a provision of the Workmen's Compensation Act should be resolved in favor of the employee." *Id.* (citations omitted).

There are several categories of job-related injuries or diseases for which Alabama's law provides compensation. One such category of diseases is "occupational pneumoconiosis," the subject of Article 5, 1975 Ala.Code §§ 25–5–140 through 25–5–152. This category does not refer to any single disease or finite set of diseases, but rather encompasses the range of impairments "caused by inhalation of minute particles of dust over a period of time." § 25–5–140. *See Wilkins v. West Point-Pepperell, Inc.*, 397 So.2d 115, 118 n. 3 (Ala.1981); *Nason v. Jones*, 278 Ala. 532, 179 So.2d 281, 284 (1965).[1]

§ 25–5–141 sets forth two requirements for compensation for occupational pneumoconiosis or dust-induced disease. First, the employee must show that the industry in which he or she works presents a "particular hazard" of the disease "in excess" of what employment in general presents. This is the requirement of legal causation. *See Alatex, Inc. v. Couch*, 449 So.2d 1254, 1257 (Ala.Civ.App.1984). Second, the employee must have a disease that "arose out of and in the course of the employment." This is the requirement of medical causation. *Id.* The court will consider each type of causation in turn.

### A.

■ Again, "[t]o establish legal causation the employee must show that in the performance of her duties she was exposed to a danger or risk materially in excess of that to which people not so employed are exposed." *Fordham v. Southern Phenix Textiles, Inc.*, 387 So.2d 204, 205 (Ala.Civ. App.), *cert. denied*, 387 So.2d 206 (Ala. 1980). Thus, the cotton workers here must show that work in the cotton textile industry exposed them to a greater risk of dust-induced disease than employment in general. All agree that work in this industry involves exposure to dust that is not present in other industries.[2] The issue is whether cotton dust presents a materially greater risk of lung disease and, if so, how.

This issue is one to which doctors and other scientists have devoted considerable study and debate for a long time. Within the last fifteen years, federal agencies and state courts, including Alabama's, have also taken up the issue in establishing safety regulations and workers' compensation programs. There is now a vast body of literature, primary and secondary, medical and legal, concerning the effects of cotton dust. *See, e.g., American Textile Manufacturers Institute, Inc. v. Donovan*, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981).

The evidence before the court includes much of this literature, as well as the testimony of several experts. The court's findings rest on a review of all the extensive details in the evidence, although they only summarize these details. Also, while other courts and agencies have considered the issue of cotton dust's effects, their findings are not conclusive since the issue is one of fact. Similarly, while much of the evidence deals with the merits and deficiencies of various studies of cotton dust, the court's findings do not focus on the studies themselves and certainly do not rely on any single study.

The court considers the issue of cotton dust's effects in three parts: first, whether cotton dust can cause lung disease; and, if

---

1. The cotton workers claim that they suffer, not only an "occupational pneumoconiosis," but also an "occupational disease," the subject of Article 4, 1975 Ala.Code §§ 25–5–110 through 25–5–123. It would appear that these are necessarily alternative claims. *See Dover Mills, Inc. v. Garrett*, 384 So.2d 1127, 1128 (Ala.Civ.App. 1980). Thus, in light of its determination regarding the occupational pneumoconiosis claim, the court need not and does not reach the occupational disease claim.

2. The Occupational Safety and Health Administration has defined this dust for purposes of regulating exposure in cotton textile mills as follows: "Any dust present during the handling and processing of cotton through the weaving or knitting of fabrics, and dust present in other operations or manufacturing processes using new or waste cotton fibers or cotton fiber by-products from textile mills is cotton dust." 29 C.F.R. § 1910.1043(b). The evidence reflects that this is an accurate and useful definition, and the court adopts it.

so, second, what in cotton dust causes such lung disease; and, third, what signs there are that cotton dust has caused such lung disease. The court considers these parts of the issue in turn.

The evidence reflects general agreement that cotton dust can impair the lungs of some people in some way. Soon after beginning to work in a cotton mill, cotton workers may experience chest tightness and breathing difficulty. For some, the experience may be so debilitating that they must change jobs; others are able to keep working with discomfort. The evidence is that those cotton workers who stop being exposed to cotton dust soon after first experiencing chest tightness and breathing difficulty find that this trouble stops too.

There is also evidence that cotton workers who remain exposed to cotton dust over several years may develop further trouble that does not go away even after exposure to cotton dust stops. Along with the same chest tightness and breathing difficulty, such cotton workers, according to the evidence, suffer permanent damage to their lungs.[3]

This evidence of permanent lung disease from exposure to cotton dust has existed for some time. Recently, some experts have criticized the way in which this evidence was gathered. In addition, some recent studies have cast doubt on cotton dust's permanent effects, though not disproving them. However, experts have also criticized these recent studies for failing to account for changed conditions in cotton mills.

The nature of the evidence would suggest that there may never be a definitive medical determination of whether cotton dust can cause permanent lung disease. However, the cotton workers here need not establish the particular hazard of cotton dust definitively. *See Dan River Mills, Inc. v. Foshee*, 365 So.2d 1232, 1237 (Ala. Civ.App.1979). In this case, the court upheld an award of workers' compensation benefits for exposure to cotton dust, saying

that "cases of this kind must be interpreted in light of the fundamental beneficent policy of the Workmen's Compensation Act. Because of the Act's remedial purposes, it should be liberally construed and all reasonable doubts resolved in favor of the employee." *Id.* Along these same lines, the Occupational Safety and Health Administration has said when setting safety levels for cotton dust that "standards cannot be postponed because definitive medical or scientific evidence is not currently available." 43 Fed.Reg. 27,351.

Along these lines, the court finds that the cotton workers have proved by a preponderance of the evidence that exposure to cotton dust presents a particular hazard of lung disease in excess of employment in general. The court finds that cotton dust can cause permanent lung disease, as well as temporary impairment of breathing. Lung disease caused by exposure to cotton dust is thus an occupational pneumoconiosis, compensable according to 1975 Ala. Code § 25–5–141.

Again, the second part of the issue before the court is what it is about cotton dust that can cause lung disease. There appears to be some element in the cotton plant that, in particles too small to see, enters the lungs and damages them over time. This element, by all accounts, is not found in the cotton fibers themselves, but some other part of the plant, such as the leaves and the stem. Dust from the leaves and stem is called bract. There is considerable speculation that bract contains the harmful element in cotton dust; however, there is also speculation that bacteria found on cotton plants contain the element. Again, conclusive medical evidence is lacking.

On this basis, the court finds that there is at present insufficient evidence to attribute the harmful effects of cotton dust to any particular component of the cotton plant. Furthermore, it is unnecessary to pinpoint any such particular harmful com-

3. The permanent lung disease caused by exposure to cotton dust is called variously byssinosis, brown lung disease and cotton textile worker's disease.

ponent of the cotton plant, since the signs of the harmful effects of exposure to cotton dust themselves are clear and specific. Indeed, attributing the lung disease caused by exposure to cotton dust to any particular component of the cotton plant risks denying compensation to cotton workers who show the signs of harmful effects, but were not exposed to the particular component. On the other hand, attributing the lung disease to exposure to cotton dust generally avoids this unfairness, since whether cotton workers show the signs of harmful effects can easily be determined.[4]

Again, the third part of the issue before the court is what signs there are of the effects of cotton dust. The evidence reflects that the most characteristic signs are the feelings of chest tightness and breathing difficulty previously described. Again, these feelings may arise soon after cotton workers begin employment. In this early stage, cotton workers also may notice that the feelings are worse on the day after they return from the weekend or vacation. Similarly, they may notice that the feelings worsen over the course of the work day. Medical tests can measure this effect by giving cotton workers samples of cotton dust to breathe and noting any differences that result. These signs in the early stages of exposure are called acute responses, because again they cease if cotton workers stop breathing cotton dust.

If cotton workers continue breathing cotton dust, the signs of ill effects appear to change. The evidence is that after several years of exposure cotton workers feel the chest tightness and breathing difficulty equally throughout the day and the week. Furthermore, these feelings last even if cotton workers stop being exposed to cotton dust. For this reason, these are called chronic responses to cotton dust indicating permanent lung disease. Medical tests can measure such permanent lung disease as a decrease in the lungs' ability to exhale. Also, there may be a measurable decrease in cotton workers' ability to exercise, even to walk short distances or climb stairs.

The evidence also reflects that cotton workers who suffer permanent lung disease from exposure to cotton dust may or may not exhibit the early signs, i.e., acute responses. Each case will depend on how quickly and seriously the cotton dust affects the cotton worker's lungs. Some cotton workers will suffer permanent lung disease and exhibit chronic responses, without ever having shown acute responses. Other cotton workers will exhibit some but not all of the acute responses, and then these responses may well disappear as the lung disease becomes permanent. Of course, some cotton workers will exhibit only acute responses and never develop permanent lung disease, and some cotton workers will never show any signs of exposure to cotton dust.

### B.

■ Again, the second requirement of compensation for occupational pneumoconiosis is medical causation. Having shown that work conditions can cause disease, the employee must show that "the exposure to conditions was, in fact, a contributing cause of her injury." *Fordham v. Southern Phenix Textiles, Inc.*, 387 So.2d 204, 205 (Ala.Civ.App.), *cert. denied*, 387 So.2d 206 (Ala.1980). Thus, "[t]he but-for test is clearly not the test for causation under Alabama's Workmen's Compensation Act. Instead, the burden is on the claimant to establish a definite causal connection between the work and the injury." *Slimfold Manufacturing Co. v. Martin*, 417 So.2d 199, 202 (Ala.Civ.App.1981); *see also Alatex, Inc. v. Couch*, 449 So.2d 1254, 1256–57 (Ala.Civ.App.1984). The question is "did

---

**4.** Dan River contends that the harmful component of the cotton plant is "respirable cotton trash dust" and that the cotton workers were not exposed to such dust. In light of the court's general attribution of the cause of lung disease, the court need not determine whether the cotton workers were exposed to such dust and whether or how this differs from cotton dust as previously defined.

It should be added that the Occupational Safety and Health Administration has also adopted a general rather than specific approach to the causes of the adverse effects of cotton dust. *See* note 2, *supra*.

the conditions, danger or risks on the job precipitate or contribute to the injury." *Newman Bros., Inc. v. McDowell,* 354 So.2d 1138 (Ala.Civ.App.), *cert. denied,* 354 So.2d 1142 (Ala.1978). Furthermore, "[t]he fact that an employee had a pre-existing disease does not affect an award of compensation if the job combined with the disease to produce injury or death." *Taylor v. United States Steel Corp.,* 456 So.2d 831, 832 (Ala.Civ.App.1984). "If a condition is *aggravated* by an accident in the course of employment, the condition is compensable even though the accident may not have caused an injury in a normal person." *Hyster Co. v. Chandler,* 461 So.2d 828, 833 (Ala.Civ.App.1984) (emphasis in original).[5]

Here, there is little if any dispute that the cotton workers all suffer lung disease. Dan River contends that in all cases cigarette smoking, along with other factors in some cases, caused this disease. The cotton workers contend that exposure to cotton dust was a significant cause of their disease. The court will first review the facts common to all the cotton workers and then consider the case of each in turn.

The evidence reflects and the court finds that all the cotton workers were exposed to cotton dust, as previously defined. Since the cotton workers worked in different areas of the mill, the cotton dust they breathed may have varied to some extent. However, any such variation is insignificant.

All the cotton workers worked in the mill for at least fifteen years, some for much longer. According to the evidence, Dan River began measuring cotton dust levels in the mill and monitoring its employees' lung conditions in the late 1970's. Thus, the cotton workers all worked in the mill considerably before such clean-up measures commenced. They also all first experienced breathing difficulty before this time. All showed one or more signs of so-called acute responses to cotton dust,

and all suffer measurable loss of their lungs' ability to exhale. Finally, one or more doctors who examined them stated that exposure to cotton dust was a significant cause of their lung disease. Such evidence, if accepted, establishes medical causation under Alabama law. *See Alatex, Inc. v. Couch,* 449 So.2d 1254, 1257 (Ala. Civ.App.1984); *Dan River Mills, Inc. v. Foshee,* 365 So.2d 1232, 1235–36 (Ala.Civ. App.1979).

All the cotton workers also smoked for many years. The evidence reflects that cigarette smoking can cause lung disease. Indeed, the evidence was that cigarette smoking and exposure to cotton dust may affect the lungs in the same way and to the same extent. Thus, that the cotton workers' lungs suffered from their smoking does not mean that they also did not suffer from exposure to cotton dust, and may well mean that they did. In *Taylor v. United States Steel Corp.,* 456 So.2d 831 (Ala.Civ. App.1984), the court recently noted that cigarette smoking would not preclude compensation if a job-related disease combined with the smoking to produce injury, though the facts of the case showed smoking to be the only cause. *Id.* at 832–33. The court considers the individual evidence along these lines.

### Marion F. Middleton

Middleton worked at Dan River from 1967 until 1982, primarily in the weave room. He began experiencing breathing difficulty in the mid-1970's. The evidence reflects that Middleton noticed his breathing as worse after he returned to work from the weekend and also showed sensitivity to cotton dust. He also smoked cigarettes for many years.

Several doctors examined Middleton, and all agreed that he has lung disease, most considering it severe. Two stated that exposure to cotton dust was a significant

---

**5.** The decisions of Alabama courts do not show any different standards for causation among the various categories of compensable injuries or diseases. § 25–5–152 states that "[a]ll the provisions of articles 1, 2, 3 and 8 of this Chapter, except section 25–5–78 [regarding notice of an accident], shall be applicable to this article, unless otherwise provided or inconsistent herewith."

cause of this disease, and another said that it may have been a contributory factor. On this basis, the court finds that Middleton's lung disease "arose out of and in the course of the employment" at Dan River. Therefore, Middleton suffers an occupational pneumoconiosis compensable according to 1975 Ala.Code § 25–5–141.

*Lonnie Hilliard*

Hilliard is now deceased. He worked at the Greenville mill from 1929 until 1980, primarily in the spinning room. He first noticed breathing difficulty in the early 1970's. The evidence reflects that Hilliard's breathing worsened during the work day. He also smoked cigarettes for many years.

Of several doctors who examined Hilliard, all agreed that he had severe lung disease. Two stated that exposure to cotton dust was a significant cause of this disease, and another could not exclude it as a contributory cause. On this basis, the court finds that Hilliard's lung disease "arose out of and in the course of the employment" at Dan River. Therefore, Hilliard suffered an occupational pneumoconiosis compensable according to 1975 Ala.Code § 25–5–141.

*Zack Schofield*

Schofield worked at Dan River from 1962 until 1980, as well as some time before that at the mill, primarily in the weave room. He first began experiencing breathing difficulty in the mid-1970's. The evidence reflects that Schofield showed sensitivity to cotton dust. He also smoked cigarettes for many years.

Again, several doctors agreed that Schofield has severe lung disease. Two said that exposure to cotton dust was a significant cause of this disease, while another could not rule it out as a contributory cause. On this basis, the court finds that Schofield's lung disease "arose out of and in the course of the employment" at Dan River. Therefore, Schofield has an occupational pneumoconiosis compensable according to 1975 Ala.Code § 25–5–141.

*Eunice McCoy*

McCoy worked at the Greenville mill from 1934 until 1982, primarily in the weave room. She first noticed breathing difficulty in the early 1970's. The evidence reflects that McCoy noticed her chest tightness and breathing difficulty as worse after the weekend or vacation. McCoy also smoked cigarettes for many years and has a serious heart condition.

The doctors who examined McCoy agreed that she has lung disease, two calling it moderate and another moderately severe. Two doctors said that exposure to cotton dust was a significant cause of McCoy's lung disease, and her heart disease appears to have contributed too. On this basis, the court finds that McCoy's lung disease "arose out of and in the course of the employment" at Dan River. Therefore, McCoy has an occupational pneumoconiosis compensable according to 1975 Ala.Code § 25–5–141.

*Clifton Smith*

Smith worked at the Greenville mill from 1947 until 1982, primarily in the card room. He first noticed breathing difficulty in the early 1970's. The evidence reflects that at first he noticed this difficulty as worse after returning from the weekend or vacation. Smith also smoked cigarettes for many years, and he too has a heart condition, related to a hormonal disorder.

Doctors who examined Smith stated that he has moderately severe lung disease, a significant cause of which was exposure to cotton dust, according to two. Smith's heart condition may have contributed too. On this basis, the court finds that Smith's lung disease "arose out of and in the course of the employment" at Dan River. Therefore, Smith suffers an occupational pneumoconiosis compensable according to 1975 Ala.Code § 25–5–141.

### III.

■ Having found that the cotton workers have compensable diseases, the court must determine first the extent of their disabilities and then the corresponding

rates of their compensation. 1975 Ala. Code § 25–5–149 refers to Article 3 of the workers' compensation law for this purpose. § 25–5–57 of this article sets forth a compensation schedule by which the court must determine whether the cotton workers have partial or total and temporary or permanent disabilities.

### A.

The key to the extent of disability is the employee's ability to earn a living. *Lankford v. International Paper Co.*, 454 So.2d 988, 989 (Ala.Civ.App.1984). To this end, the relevant factors include the employee's age, training, general health and education. *Allen v. Metro Contract Services, Inc.*, 421 So.2d 1289, 1293 (Ala.Civ.App.1982). "[I]n making a determination as to the extent of disability, the trial court must consider all of the evidence, including its own observations, and interpret it according to its own best judgment." *The Goodyear Tire and Rubber Co. v. Greene*, 426 So.2d 851, 852 (Ala.Civ.App.1983).

In *City of Muscle Shoals v. Davis*, 406 So.2d 919 (Ala.Civ.App.), *cert. denied*, 406 So.2d 923 (Ala.1981), the court said that "[t]otal disability does not mean absolute helplessness or entire physical disability, but it is the inability to perform the work of one's trade (manual labor in this case) or inability to obtain reasonably gainful employment." *Id.* at 923; *see also Jr. Food Stores of West Florida, Inc. v. Garvin*, 447 So.2d 794, 795 (Ala.Civ.App.1984).

In *Hyster Co. v. Chandler*, 461 So.2d 828 (Ala.Civ.App.1984), the court found permanently and totally disabled an employee with a ninth grade education and experience only in manual labor who suffered lung and heart disease. *Id.* at 833. In *Stebbins Engineering & Manufacturing Co. v. White*, 457 So.2d 425 (Ala.Civ.App. 1984), the court made a similar finding even though the employee's medical condition itself was not totally disabling. *Id.* at 427. On this basis, the court finds each of the cotton workers to be totally disabled according to 1975 Ala.Code § 25–5–57.

The court has already found that the cotton workers' lung disease is permanent.

### *Marion F. Middleton*

Middleton is 58 years old and has an eleventh-grade education. His work at Dan River involved only manual labor; besides this work, Middleton served as a cook in the army, a truck driver and a store manager.

The medical evidence was that Middleton is totally impaired as a result of his lung disease and also suffers hypertension. On this basis, the court finds that Middleton is unable to earn a living and thus is permanently and totally disabled.

### *Lonnie Hilliard*

At his death, Hilliard was 70 years old, had a second-grade education and could not read or write. His work at Dan River involved only manual labor and, except for a few months he spent at a shipyard, took up all his working life.

The medical evidence was that Hilliard was totally impaired as a result of his lung disease. On this basis, the court finds that Hilliard was unable to earn a living and thus was permanently and totally disabled.

### *Zack Schofield*

Schofield is 59 years old, has a fourth-grade education and cannot read or write. His work at Dan River involved only manual labor, and, besides this, he worked in a factory and on a farm.

The medical evidence was that Schofield is totally impaired as a result of his lung disease and also suffers hypertension. On this basis, the court finds that Schofield is unable to earn a living and thus is permanently and totally disabled.

### *Eunice McCoy*

McCoy is 67 years old and has a high school education. Her work at Dan River involved only manual labor and took up all her working life.

The medical evidence was that McCoy is partially impaired as a result of her lung disease. She also suffers heart and brain

disease. On this basis, the court finds that McCoy is unable to earn a living and thus is permanently and totally disabled.

Dan River contends that it cannot be held liable for the full extent of McCoy's disability, because it is partly due to her heart and brain disease which are unrelated to her employment. This contention is meritless.

1975 Ala.Code § 25–5–58 excuses the employer from liability for that "degree or duration of disability ... increased or prolonged because of a preexisting injury."[6] However, "[i]t is a fundamental principle that the employer takes the employee subject to his physical condition when he enters his employment." *Allen v. Metro Contract Services, Inc.,* 421 So.2d 1289, 1291 (Ala.Civ.App.1982). "Therefore, the trial judge's consideration of employee's 'general physical condition' as a factor in reducing his compensation was impermissible as it, in effect, treated the employee's general health as a pre-existing condition to reduce the award." *Id.* So, if the employee is able to work as a normal person and shows "no apparent physical effect" from the pre-existing disease at the date of injury, the employer is fully liable. *North Alabama Nursing Home, Inc. v. Borden,* 442 So.2d 112, 114 (Ala.Civ.App.1983), *quoting Ingalls Shipbuilding Corp. v. Cahela,* 251 Ala. 163, 36 So.2d 513, 521 (1948).

Here, the date of McCoy's injury, according to 1975 Ala.Code § 25–5–147, was when she was last exposed to cotton dust, her last day of work in 1982. There is no evidence before the court that McCoy's heart or brain disease had an apparent physical effect on her ability to work at that time. Therefore, the court finds that Dan River is liable for the full extent of her disability. *See Ex Parte Lewis,* 469 So.2d 599, 601 (Ala.1985).

*Clifton Smith*

Smith is 61 years old, has a seventh-grade education and cannot read or write. His work at Dan River mostly involved manual labor, although he worked for some time as a shift supervisor.

The medical evidence was that Smith is partially impaired as a result of his lung disease. He also suffers a hormonal disorder, heart disease and blindness in one eye. On this basis, the court finds that Smith is unable to earn a living and thus is permanently and totally disabled.

Dan River does not contend that it cannot be liable for the full extent of Smith's disability. Moreover, the evidence reflects and the court finds that Smith's other ailments had no apparent physical effect on his ability to work on the day he was last exposed to cotton dust. Therefore, Dan River is liable for the full extent of Smith's disability.

**B.**

According to 1975 Ala.Code § 25–5–57, employees with permanent and total disabilities are entitled to receive weekly compensation from the date of their injuries until either the end of their disabilities or their deaths. The rate of compensation is set at two-thirds of the employees' average weekly earnings during the last year they worked, with a maximum rate of two thirds and a minimum rate of one quarter of the average weekly wage of the state at the date of injury. 1975 Ala.Code § 25–5–68. Again, here, the date of injury is the date of last exposure to cotton dust. 1975 Ala. Code § 25–5–147.

Applying these provisions, the court finds that the cotton workers are entitled to compensation at the following weekly rates: Marion F. Middleton, $143.55; Lonnie Hilliard, $148; Zack Schofield, $135.87; Eunice McCoy, $103.62; Clifton Smith,

---

**6.** Dan River does not contend, nor apparently could it, that it cannot be liable for the extent to which the cotton workers' disabilities may have been caused by cigarette smoking. As stated, smoking and exposure to cotton dust both contribute to lung disease. However, according to § 25–5–58, liability may be apportioned only among different diseases, not among different causes of a disease. *See* 2 A. Larson *The Law of Workmen's Compensation* § 59.22.

$174.[7] The court will award the cotton workers future benefits at these rates.

The cotton workers are also entitled to receive benefits that have accrued since they last worked at Dan River according to these weekly rates. The court will determine the amounts of these benefits only after giving the parties an opportunity to agree on them.

The cotton workers also seek an award of attorney fees according to 1975 Ala. Code § 25–5–90 with any prospective amount awarded in a present value lump sum. *See Fruehauf Corp. v. Keenum*, 466 So.2d 137 (Ala.Civ.App.1984). Dan River challenges the cotton workers' attorneys' entitlement to any fee, on the grounds that their employment has not been approved according to 1975 Ala.Code § 25–5–90. The court will allow the cotton workers an opportunity to submit the appropriate applications for approval according to the statute. Dan River also challenges the attorneys' entitlement to a prospective amount. The court must wait until the amounts of benefits due the cotton workers, retrospectively and prospectively, have been determined.

## IV.

The final issue before the court is whether the claims of four of the cotton workers are barred by the statute of limitations. The court finds that they are not.

According to 1975 Ala.Code § 25–5–147, an employee must file a claim for compensation for occupational pneumoconiosis within one year of "the date of the last exposure to the hazards of the disease...." Nevertheless, there are two ways by which the running of the statute of limitations may be tolled: fraudulent concealment and false representation. In *Dorsey v. U.S. Pipe & Foundry Co.*, 353 So.2d 800 (Ala.1977), the Alabama Supreme Court said that

> where the acts of the employer either falsely misrepresent to the employee or fraudulently conceal from him the truth of the facts upon which the liability of the employer depends, the running of the statute of limitations may be tolled, and it is immaterial whether the employee relies upon actual fraud or mere estoppel.

*Id.* at 803; *see also Ex Parte Youngblood*, 413 So.2d 1146, 1149 (Ala.1981) (an employer may "innocently or fraudulently ... mislead the claimant...."). Whether the statute is tolled is an issue of fact. *Mayes v. Dake*, 434 So.2d 271, 273 (Ala.Civ.App. 1983); *Ex Parte Youngblood*, 413 So.2d 1146, 1149 (Ala.1981).

To establish fraudulent concealment, an employee must prove four facts: (1) that the employer knew or should have known that the employee was suffering from a disease or infirmed condition; (2) that the employer knew or should have known that the employee did not know of this disease or condition; (3) that the employee did not have reason to understand either the nature and gravity of the condition or its relation to the employment; and (4) that the employer failed to disclose to the employee the nature and extent of the employee's condition. *Belser v. American Cast Iron Pipe Co., Inc.*, 356 So.2d 659, 663 (Ala.Civ.App.1978).

False representation, on the other hand, is an issue of whether the employer is "primarily responsible" for the employee's delay in filing the claim. *Ex Parte Youngblood*, 413 So.2d 1146, 1149 (Ala.1981).

---

7. Dan River has agreed with Middleton and Schofield on their final rates of compensation. With Hilliard and Smith, it agrees on their average weekly earnings, but disputes their maximum weekly benefits allowable. According to 1975 Ala.Code § 25–5–68, the maximum weekly benefit allowable is two-thirds of the state's average weekly wage in effect on the date of their last exposure to cotton dust, and this "shall be applicable for the full period during which compensation is payable." The court finds that the maximum weekly benefits allowable for Hilliard and Smith respectively are $148 and $174.

Dan River and McCoy dispute her average weekly earnings for the 52 weeks before she last worked at Dan River. The court credits Dan River's records and finds that McCoy's earnings were $155.43. Two-thirds of this amount produces McCoy's final rate of compensation.

The employer must commit an "overt act ... that lulls the employee into inaction." *Mayes v. Dake*, 434 So.2d 271, 273 (Ala.Civ. App.1983). This estops the employer from raising the statute of limitations as a defense. *Id.*

Here, Hilliard, Schofield and McCoy concede that they filed their claims late. The court thus considers whether Dan River's conduct warrants tolling of the limitation, looking first to the facts common to the cotton workers and then to their individual circumstances. Finally, the court considers whether Smith's claim was filed late and is barred.

As previously noted, Dan River has employed the cotton workers for most and in some cases all of their working lives. Throughout this time, the cotton workers almost exclusively performed manual labor. In addition, they remained functionally illiterate with one exception. To the court's observation at trial, the confusion and intimidation attendant to these circumstances were palpable.

In the early and mid-1970's, the cotton workers began noticing chest tightness and breathing difficulty. In the late 1970's, Dan River began operating a medical department to monitor the health of its employees. In December 1979, it sent some of its employees for further examinations to a doctor in Birmingham, Alabama. After these examinations, the doctor sent reports to Dan River which gave them to at least some of the cotton workers, as well as sending them to some of their personal physicians.

In the summer of 1983, the Brown Lung Association, an organization apparently devoted to the interests of cotton workers, sent representatives to the Greenville area. The plaintiff cotton workers all participated in this visit. These lawsuits ensued.

On this basis, the court makes the following additional findings of fact and notes the following additional principles of law. First, Dan River knew or should have known that exposure to cotton dust can cause permanent lung disease. As stated, the evidence of such disease has existed for some time. While recently disputed, this evidence is substantial. Dan River took steps to monitor its employees' health in response to such evidence, and defended against claims for compensation based on it. *See Dan River Mills, Inc. v. Foshee*, 365 So.2d 1232 (Ala.Civ.App.1979).

Second, because Dan River operated a medical department, it had "a duty to disclose (or have its medical department disclose) a condition which its medical staff has determined to exist or which the staff in exercise of reasonable care should have diagnosed." *Belser v. American Cast Iron Pipe Co., Inc.*, 356 So.2d 659, 664 (Ala.Civ.App.1978); *cf. Barnes v. Liberty Mutual Insurance Co.*, 468 So.2d 124 (Ala. 1985) (no duty to warn from mere knowledge of hazards of cotton dust). This would include what the doctor in Birmingham found and reported to Dan River. *See Ex Parte Youngblood*, 413 So.2d 1153, 1154 (Ala.1982); *Freeman v. Blue Mountain Industries*, 395 So.2d 1049, 1052 (Ala. Civ.App.1981).

Third, the cotton workers' circumstances, including their education, are relevant in determining whether they had reason to understand the nature and gravity of their condition and its relation to their employment. *See Belser v. American Cast Iron Pipe Co., Inc.*, 356 So.2d 659, 664 (Ala.Civ. App.1978) (employee with sixth-grade education reasonably ignorant); *Mayes v. Dake*, 434 So.2d 271, 272 (Ala.Civ.App. 1983) (employee with fourth-grade education misled). This is a principle recognized in other states as well. *See* 3 A. Larson *The Law of Workmen's Compensation* § 78.45; *Neuberger v. Hennepin County Workhouse*, 340 N.W.2d 330, 332 (Minn.1983);[8] *Perkins v. Aetna Casualty & Surety Co.*, 147 Ga.App. 662, 249 S.E.2d 661, 663 (1978).

---

8. Alabama's workers' compensation law was modeled after Minnesota's law, and the Alabama Supreme Court has held that Minnesota's courts' construction of its law is of persuasive value to Alabama's courts. *Gold Kist, Inc. v. Barnett*, 439 So.2d 703, 704 (Ala.Civ.App.1983).

**1218**

■ The court considers the individual evidence according to these findings and principles.

*Lonnie Hilliard*

The evidence reflects first that Dan River knew that Hilliard suffered lung disease, of which a significant cause was exposure to cotton dust. Dan River's doctor in Birmingham could not rule out this diagnosis. Dan River also had results of tests by its medical department.

Furthermore, Dan River knew or should have known that Hilliard did not know of his disease. Although first noticing breathing difficulty in the early 1970's, Hilliard continued to work for several years. Dan River was aware of this. It also knew that Hilliard had very little education and understanding. His continued ignorance of his condition was obvious at trial.

While Hilliard said that, after visiting Birmingham, he had "some idea" that his breathing difficulty was related to his work, he did not "know of his disease" even at the time of trial. More than a confused and uninformed suspicion is required to warrant barring a claim if the "construction of the limitations provisions of the workmen's compensation law is in accordance with the well recognized rule that the workmen's compensation law must be liberally construed in furtherance of its beneficent and humanitarian purposes." *Ex Parte Youngblood*, 413 So.2d 1146, 1149 (Ala.1981).

Similarly, the court finds that Hilliard did not have reason to understand either the nature and gravity of his disease or its relation to his employment. His circumstances were such that he required a clear explanation to achieve such understanding. He had worked at Dan River from the age of fourteen with only a brief interruption. He had only a second-grade education and could not read or write. Again, his confusion and incomprehension regarding even simple matters were readily apparent. Hilliard did not receive the explanation he reasonably required.

The evidence shows that it was not enough for Dan River to give Hilliard a copy of the medical report prepared by its doctor in Birmingham. From the court's own observation, this complex report would be intelligible only to those trained in the sciences dealing with such disease as cotton dust causes. Dan River was aware that most of its employees were illiterate or semi-literate. Dan River also knew that it had a legal obligation to make the contents of the reports known to its diseased employees. *Belser, supra.* Dan River therefore gave the technical report, unexplained, to its uneducated, diseased employees with the hope of discharging its legal obligation while at the same time effectively keeping its diseased employees unaware of the true nature, gravity, and cause of their disease. The giving of the doctor's reports was an empty, indeed fraudulent, gesture designed solely to protect Dan River rather than its employees.

Also, it was not enough to send the report to Hilliard's doctor. Dan River made no serious effort to assure that those doctors who received the reports about their diseased patients understood the significance of the technical report or that they made the contents and significance of the reports known to their patients in an understandable manner. Also, Hilliard cannot be faulted for any inaction by his doctor. Therefore, Dan River fraudulently concealed from Hilliard the truth of the facts on which its liability depends.

Alternatively, the court finds that Dan River was primarily responsible for Hilliard's delay in filing his claim and thus committed false representation. Over the years, Dan River developed a relationship of trust with its employees. By its actions, Dan River led them to believe that it would specifically protect them from the health hazards caused by their employment. As stated, the company took specific steps to monitor its employees' health. Under these circumstances, Hilliard reasonably relied on Dan River to bring to his attention risks posed by his employment and, if necessary, to take appropriate steps to protect him from such risks. Dan River failed to

do this. At no time did Dan River take specific, affirmative steps to assure that Hilliard was no longer exposed to the harm of cotton dust, or that Hilliard's continued exposure was with his complete understanding of the known risks to his health.

Dan River also failed to disclose to Hilliard the nature and extent of his disease. After taking him into its trust, Dan River at no time warned him in clear and adequate terms that he was a diseased employee, even though, as this court has found, Dan River knew or should have known of his diseased state. Hilliard's claim is thus timely.

### Zack Schofield

The evidence reflects that Dan River knew that Schofield also suffers lung disease, of which a significant cause was exposure to cotton dust. Again, this was a diagnosis that Dan River's doctor in Birmingham could not exclude, and Dan River had other tests results, too.

Dan River also knew or should have known that Schofield did not know of his disease. As Dan River was aware, Schofield began experiencing breathing difficulty in the mid-1970's, yet continued to work. The company also knew that he had little education and understanding, and remains confused about his condition.

Dan River contends that Schofield showed understanding of his condition when he asked a lawyer retained to obtain workers' compensation benefits for a knee injury whether he could file a claim for his breathing problems; the lawyer apparently told him that he could not. That an employee consults a lawyer is a factor in whether the employer is primarily responsible for the employee's delay in filing a claim. *Mayes v. Dake*, 434 So.2d 271, 273–74 (Ala.Civ.App.1983). However, here, the court finds that Schofield showed no understanding of either the nature and gravity of his disease or its relation to his employment when he consulted the lawyer; to the contrary, asking his lawyer showed lack of understanding. Furthermore, Schofield gained no understanding or reason to have understanding from the lawyer. The lawyer's dealings with Schofield were strictly limited to the knee injury. If the lawyer contributed to Schofield's failure to file a claim for his lung disease, Dan River was still primarily responsible. It had knowledge of Schofield's health and the effects of cotton dust. The lawyer reasonably did not have such knowledge under the circumstances.

Similarly, the court finds that Schofield did not have reason to understand either the nature and gravity of his disease or its relation to his employment. His circumstances were such that he too required a clear explanation. He first worked at the Greenville mill at the age of sixteen and then returned after working elsewhere. He is unable to read or write. Again, his confusion and incomprehension are obvious. Schofield did not receive the explanation he reasonably required to understand his condition.

The evidence also reflects that Dan River failed to disclose to Schofield the nature and extent of his disease. Again, giving him or his doctor a copy of the report by its doctor in Birmingham was insufficient. Therefore, Dan River fraudulently concealed from Schofield the truth of the facts on which its liability depends. Alternatively, the court finds, for the same reasons given above regarding Hilliard, that Dan River was primarily responsible for Schofield's delay in filing his claim and thus committed false representation. Schofield's claim is thus timely.

■ Dan River also contends that Schofield's claim is barred by a release he signed settling a claim against Dan River for a knee injury. Such a release "if unambiguous in meaning, will be given effect according to the intention of the parties to be judged by the court from what appears within the four corners of the instrument itself...." *Finley v. Liberty Mutual Insurance Co.*, 456 So.2d 1065, 1067 (Ala. 1984), quoting *Miles v. Barrett*, 223 Ala. 293, 134 So. 661 (1931).

Here, the release simply referred generally to the petition filed by the parties.

Therefore, the surrounding circumstances may help to determine the intention of the parties. *See Rivers v. Oakwood College,* 442 So.2d 74, 76 (Ala.1983). While the petition itself referred to "any and all claims employee has or may have in the future," it was part of a claim that involved only the knee injury. There is no indication that anyone intended it to bar a claim that Schofield might later make for lung disease. To give the release such effect would violate reason and fairness. On this basis, the court finds that Schofield's present claim is not barred by the release.

Alternatively, the court finds that, even were the release binding, Schofield is entitled to relief from it. In *Fabarc Steel Supply, Inc. v. Davis,* 422 So.2d 797 (Ala. Civ.App.1982), the court granted such relief where the "plaintiff, uneducated and not qualified to relate the shoulder pain to the on-the-job injury, accepted the settlement in reliance on representations that the settlement amount was all the money to which he was entitled." *Id.* at 799. Schofield's circumstances are similar to these. Although he had a lawyer, neither he nor the lawyer could be expected to relate his breathing difficulty to exposure to cotton dust.

*Eunice McCoy*

The evidence reflects that Dan River should have known that McCoy suffers lung disease, of which a significant cause was exposure to cotton dust, even if it did not actually know this. McCoy first noticed breathing difficulty in the early 1970's. Dan River began monitoring her health in the late 1970's. However, its medical department gave her only questionnaires and simple breathing tests, while other employees received more tests from Dan River's doctor in Birmingham. The evidence is that these additional tests are necessary to identify lung disease caused by exposure to cotton dust. In failing to give McCoy such tests, especially while giving them to other employees, Dan River breached the applicable standard of due care.

Dan River contends that it failed to give McCoy these examinations because she did not disclose some of her symptoms, apparently due to her impression that health problems might lead to termination of her employment. The court cannot say that this impression was unreasonable even if it was inaccurate. More significantly, the evidence is that McCoy did disclose her symptoms on some occasions and, in any event, Dan River also conducted tests that did not depend on her confidence and frankness. Dan River should have conducted more such tests.

■ Thus, Dan River's contention that McCoy should be estopped from relying on tolling of the statute of limitations lacks merit. Estoppel arises when one takes inconsistent positions in different instances to another's reliance and prejudice. *United States Fidelity & Guaranty Co. v. McKinnon,* 356 So.2d 600, 606 (Ala.1978). Estoppel is "a principle of equity that operates not to create a right nor to impose an obligation, but to prevent an otherwise unjust result." *Williams v. FNBC Acceptance Corp.,* 419 So.2d 1363, 1367 (Ala. 1982). Here, there is no evidence that Dan River relied on anything that McCoy said or did to its prejudice. The evidence is that, even had Dan River sent McCoy to the doctor in Birmingham and learned of her condition, it would have acted no differently. Again, it had a duty to disclose to McCoy what its medical department should have diagnosed. *Belser v. American Cast Iron Pipe Co., Inc.,* 356 So.2d 659, 664 (Ala.Civ.App.1978). It cannot shirk its duty by imposing a duty on McCoy that does not exist. Finally, estopping McCoy from relying on tolling of the statute of limitations would not prevent an unjust result, but produce one. It would be unjust to allow Dan River to cloak its actions with McCoy's fear and ignorance.

The evidence also reflects that Dan River knew or should have known that McCoy did not know of her disease. She too first noticed breathing difficulty in the early 1970's, yet continued to work. Dan River knew or should have known of this. It

certainly knew that she had little understanding about her condition, if more education than the others. McCoy's confusion and incomprehension were most apparent of all.

Similarly, the court finds that McCoy did not have reason to understand either the nature and gravity of her disease or its relation to her employment. The evidence also reflects that Dan River failed to disclose to McCoy the nature and extent of her disease.

Therefore, Dan River fraudulently concealed from McCoy the truth of the facts on which its liability depends. Alternatively, the court finds, that Dan River was primarily responsible for McCoy's delay in filing her claim and thus committed false representation. McCoy's claim is thus timely.

*Clifton Smith*

■ Dan River also contends that Smith's claim is barred by the statute of limitations. Smith does not rely on tolling of the limitation, but rather contends that he filed his claim within one year of the last day of his exposure.

It is undisputed that Smith's last day of work was October 26, 1982, and that he filed his claim on October 26, 1983. However, Dan River offered evidence that production in the card room where Smith worked stopped on October 21, 1982. Even if true, however, this does not mean that Smith's exposure to cotton dust stopped on that day.

The evidence is that cotton dust remains in the work environment during and after production. It settles on machinery where it must be blown off; it floats in the air where levels are monitored. Furthermore, the card room is one of the dustiest areas in the mill, and dust may also enter the card room from other areas. Thus, the end of production in the card room did not stop Smith's exposure to cotton dust.

There is also no evidence that Smith was confined to the card room for the last five days he worked. Any passage through areas of the mill where production contin-ued also exposed him to cotton dust. On this basis, the court finds that Smith was exposed to cotton dust within the limitation period, so his claim is not barred.

## V.

Also before the court is plaintiff Lonnie Hilliard's counsel's motion for court to enter judgment nunc pro tunc. For the reasons that follow, the court concludes that the motion should be granted.

Hilliard brought this action against Dan River on December 20, 1983. The trial of this cause lasted from October 10 until October 15, 1984. The court set the cause for submission of the parties' post-trial briefs on November 8, 1984, and extended this date until November 16, 1984, when the court took the cause under submission. On April 6, 1985, Hilliard died. On May 15, 1985, Hilliard's counsel filed the motion for judgment nunc pro tunc.

■ Judgment nunc pro tunc is a judgment given effect as of a date in the past. *See* 6A *Moore's Federal Practice* § 58.08 (2d ed.) at 58–75. "The Latin phrase 'nunc pro tunc' literally means 'now for then.' " *Id.* Here, Hilliard's counsel seeks a judgment in Hilliard's favor as of the date this cause was submitted to the court.

The first issue for the court is what doctrine of judgment nunc pro tunc to apply. This is a diversity action, so the court must follow the substantive law of Alabama. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see e.g., Cambridge Mutual Fire Insurance Co. v. City of Claxton, Ga.*, 720 F.2d 1230, 1232 (11th Cir.1983). However, in some matters, federal law applies. *See, e.g., Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1323 (11th Cir.1982).

Here, the court concludes first that it need not determine whether Alabama or federal law applies because the two are identical. However, assuming that the two differ, the court concludes that it must follow federal law. The court explains these two conclusions in turn.

## A.

■ There are at least two distinct varieties of judgments nunc pro tunc: those to correct errors in a judgment already entered; and those to protect parties from the court's delay in entering judgment during which a party has died. 6A *Moore's Federal Practice* § 58.08 (2d ed.) at 58–76. Federal law recognizes both these varieties of judgments nunc pro tunc. *Cuebas Y Arredondo v. Cuebas Y Arredondo*, 223 U.S. 376, 390, 32 S.Ct. 277, 281, 56 L.Ed. 476 (1911) ("Such a decree presupposes a decree allowed, or ordered, but not entered, through inadvertence of the court; or a decree in a cause which is under advisement when the death of a party occurs."); *United States v. Hitchmon*, 587 F.2d 1357, 1360 (5th Cir.1979) ("Orders may be entered nunc pro tunc to the end that the record accurately reflect what was actually done on a previous date or to protect the parties from the consequences of delay by the court not attributable to any fault on their part."). Alabama law also recognizes both varieties. *Compare Michael v. Michael*, 454 So.2d 1035, 1037–38 (Ala.Civ. App.1984) (judgment nunc pro tunc to correct error allowed) *with Birmingham Railway, Light & Power Co. v. Cunningham*, 141 Ala. 470, 37 So. 689 (1904) (judgment entered nunc pro tunc where party died after case submitted).

■ These two varieties of judgments nunc pro tunc have appropriately different prerequisites. Thus, judgment nunc pro tunc to correct an error or omission requires that the court have made some prior indication of its ruling. *Recile v. Ward*, 496 F.2d 675, 680 (5th Cir.1974); *Michael v. Michael*, 454 So.2d 1035, 1037 (Ala.Civ.App. 1984). On the other hand, judgment nunc pro tunc to protect against the court's delay when a party has died does not require such indication, but does require that the cause be "ripe for judgment" when the party dies. 49 Corpus Juris Secundum § 118 at 252. Hilliard's counsel seeks this latter variety of judgment nunc pro tunc.

A court's power to enter judgment nunc pro tunc where a party has died derives from Anglo-American common law, symbolized by the maxim, "the act of the court shall prejudice no one." *See* 46 Am.Jur.2d, *Judgments* §§ 97–105; 49 Corpus Juris Secundum § 118; 3 American Law Reports 1403. "The rule established by the general concurrence of the American and English courts is, that where the delay in rendering a judgment or decree arises from the act of the court, that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, either the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties, the judgment or decree may be entered retrospectively, as of a time when it should or might have been entered up." *Mitchell v. Overman*, 103 U.S. (13 Otto) 62, 64–65, 26 L.Ed. 369 (1880); *see also Parker v. Ellis*, 362 U.S. 574, 598–99, 80 S.Ct. 909, 923, 4 L.Ed.2d 963 (1960) (Douglas, J., dissenting).

■ The requirements of judgment nunc pro tunc at common law are: that the cause be ripe for judgment when the party dies; that the delay in judgment not be the fault of the prevailing party; and that innocent third persons acquiring rights since the death of the party will not be injured. 46 Am.Jur.2d *Judgments* §§ 97 & 98. The U.S. Supreme Court has followed these requirements and granted judgment nunc pro tunc on numerous occasions. *Harris v. Commissioner of Internal Revenue*, 340 U.S. 106, 113, 71 S.Ct. 181, 185, 95 L.Ed. 111 (1950); *McDonald v. Maxwell*, 274 U.S. 91, 99, 47 S.Ct. 497, 499, 71 L.Ed. 942 (1927); *Quon Quon Poy v. Johnson*, 273 U.S. 352, 359, 47 S.Ct. 346, 348, 71 L.Ed. 680 (1927); *Bell v. Bell*, 181 U.S. 175, 179, 21 S.Ct. 551, 553, 45 L.Ed. 804 (1901); *Richardson v. Green*, 130 U.S. 104, 116, 9 S.Ct. 443, 447, 32 L.Ed. 872 (1889). In *Cuebas Y Arredondo v. Cuebas Y Arredondo*, the Court said that judgment nunc pro tunc was unavailable because the deceased party died before judgment was ripe. 223 U.S. at 390, 32 S.Ct. at 281. The power of a court following federal common law to enter judgment nunc pro tunc is thus well established.

There is no indication that the law of Alabama is any different from federal common law in this regard. By statute, Alabama has adopted the "common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state...." 1975 Ala.Code § 1–3–1. The parties have submitted no authority indicating that Alabama has departed from the common law doctrine of judgment nunc pro tunc, nor is the court aware of any such authority. To the contrary, in *Birmingham Railway, Light & Power Co. v. Cunningham*, 141 Ala. 470, 37 So. 689 (1904), the Alabama Supreme Court applied this doctrine. Where a party died after submission of the cause to the court, it entered judgment nunc pro tunc as of the date of submission. *Id.* Thus, the doctrine of judgment nunc pro tunc is also established in Alabama law, albeit without recent application. The court therefore need not decide whether to follow federal common law or Alabama law since both provide the same standard of law.

### B.

Dan River contends that entering judgment nunc pro tunc in favor of Hilliard would contravene a rule of Alabama's workers' compensation law that the right to benefits survives the death of a claimant only if the cause of death is job related. Although this contention ignores Alabama's application of the doctrine of judgment nunc pro tunc to protect parties from delay when a party has died, the court nevertheless treats it as an argument that such application is not well established and that the court should follow established Alabama workers' compensation law rather than federal common law of judgment nunc pro tunc. According to the rule of *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 [1938], the argument lacks merit.

■ Again, the *Erie* rule requires a federal court with diversity jurisdiction to follow state law on issues of substance, but not on other issues. *See* C. Wright, A. Miller & E. Cooper *Federal Practice and Procedure: Jurisdiction* § 4501. In guiding courts on which law to follow, the U.S. Supreme Court has relied on several considerations, including distinguishing substantive and procedural rules, determining how rules affect outcome, looking to federal policy and avoiding inequitable administration of the law. *See id.* § 4504.

■ Recently, in *Sibaja v. Dow Chemical Corp.*, 757 F.2d 1215 (11th Cir.1985), the Eleventh Circuit upheld a decision dismissing a lawsuit according to the federal forum non conveniens doctrine where the appropriate state doctrine would have required the opposite result. The court reaffirmed that "[t]he *Erie* rule holds that neither Congress nor the courts have the constitutional authority to promulgate the substantive rule of law that controls the controversy in a diversity case...." 757 F.2d at 1219. Nevertheless, the court said that the decision to follow a federal common law doctrine that altered the outcome did not violate the *Erie* rule, since it was not "a decision going to the character and result of the controversy. Rather it was a decision that occurred before, and completely apart from, any application of state substantive law." 757 F.2d at 1219. In reaching this conclusion, the court characterized the doctrine of forum non conveniens as "but one manifestation" of "the court's inherent power, under article III of the Constitution, to control the administration of the litigation before it and to prevent its processes from becoming an instrument of abuse, injustice and oppression." 757 F.2d at 1218.

In *Southern v. Plumb Tools*, 696 F.2d 1321 (11th Cir.1983), the Eleventh Circuit found error in the district court's failure to follow state rules in a workers' compensation case under Alabama law. In so concluding, the court said, "[w]e can identify no strong federal interest requiring us to uphold a procedural ruling that severely undermines Alabama's substantive law ..., particularly since federal courts have vigorously applied the collateral source rule to prohibit evidence regarding payment of

workmen's compensation benefits." 696 F.2d at 1323 (citations omitted).

The Alabama rule at issue here, according to Dan River's contention, provides that survivors of a deceased plaintiff seeking workers' compensation benefits may maintain the claim only if the job-related injury caused the death. The Alabama Court of Civil Appeals set forth this rule in *Smith v. West Point-Pepperell, Inc.*, 431 So.2d 1268 (Ala.Civ.App.1983). The court reasoned that provisions in the workers' compensation law that the right to benefits survives only if death is job related prohibited application of Alabama's general survival statute because of the law's exclusive remedy provision. 431 So.2d at 1269. The court said that neither Alabama's constitution nor "the fundamental beneficent purpose of the Workmen's Compensation Act" compelled a contrary result. 431 So.2d at 1270. "... [T]he court must give effect to the plain meaning of the Act as enacted by the legislature, regardless of our view of the wisdom, fairness or equity of such.... Nonetheless, we do not wish to be read as in any manner sanctioning a legislative enactment which, contrary to the stated beneficient purpose of the Act, deprives dependents of benefits...." 431 So.2d at 1271.

The court here would note first that the rule set forth in *Smith v. West Point-Pepperell, Inc.* is not directly applicable. In *Smith,* the plaintiff had died after filing a complaint for workers' compensation benefits but before his case was submitted to the court. 431 So.2d at 1269. Thus, the court did not have the opportunity to consider applying the doctrine of judgment nunc pro tunc, but only Alabama's survival statute. This statute was excluded because Alabama's workers' compensation law has survival provisions that its exclusive remedy provision makes mandatory. 431 So.2d at 1269. Alabama's workers' compensation law has no judgment nunc pro tunc provision that the exclusive remedy provision would similarly make mandatory.

Additionally, the court in *Smith v. West Point-Pepperell, Inc.* identified no policy or principle underlying its result but relied only on "the plain language of the statute." 431 So.2d at 1270. In fact, the court said that the result violated the general policy of the workers' compensation law. 431 So.2d at 1271.

The common law doctrine of judgment nunc pro tunc, over which Dan River would have the court follow Alabama's survival rule, contrastingly rests on important principles to which this court is beholding. Again, the doctrine derives from the maxim that the act of the court should prejudice no one. This maxim has more than historic value. The doctrine of judgment nunc pro tunc, like the doctrine of forum non conveniens, would seem a manifestation of "the equitable powers of the courts of law over their own processes, to prevent abuses, oppression and injustice." *Gumbel v. Pitkin,* 124 U.S. 131, 144, 8 S.Ct. 379, 383, 31 L.Ed. 374 (1888), *quoted in Sibaja v. Dow Chemical Corp.,* 757 F.2d 1215, 1218 (11th Cir. 1985).

As in *Sibaja,* it is not determinative that application of the doctrine of judgment nunc pro tunc alters the outcome here. 757 F.2d at 1219. Like forum non conveniens, judgment nunc pro tunc has its application completely apart from any application of state substantive law, although coming after rather than before such application. 757 F.2d at 1219. This court followed Alabama law exclusively in determining that Hilliard should prevail on the merits of his workers' compensation claim. *See* Parts II–V *supra.* Judgment nunc pro tunc would simply protect against delay caused by this court in deciding the merits of Hilliard's claim. The court should be responsible for its delay and follow rules consistent with its responsibility. Only in this way can the court "prevent its processes from becoming an instrument of abuse, injustice and oppression." 757 F.2d at 1218.

For this reason, the issue here is unlike that in *Southern v. Plumb Tools,* 696 F.2d 1321 (11th Cir.1983), where the court could "identify no strong federal interest requiring us to uphold a procedural ruling that

severely undermines Alabama's substantive law...." 696 F.2d at 1323. First, the doctrine of judgment nunc pro tunc does not threaten Alabama law, since itself having a place in it and not directly conflicting with the survival rule set forth in *Smith v. West Point-Pepperell, Inc.* Second there is a strong federal interest in the doctrine of judgment nunc pro tunc here. This is most obviously the court's previously identified interest in controlling its processes.

However, the court also has a concern that there may be a stronger interest here in applying the judgment nunc pro tunc doctrine. In *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), the U.S. Supreme Court found that a state procedure permitting the delay of state officials in considering an employment discrimination claim to bar that claim violated due process. 455 U.S. at 434, 102 S.Ct. at 1157. "A system or procedure that deprives persons of their claims in a random manner ... necessarily presents an unjustifiably high risk that meritorious claims will be terminated." 455 U.S. at 434–435, 102 S.Ct. at 1157.

Here, as in *Logan,* the issue is one of procedure, not substance. 455 U.S. at 433, 102 S.Ct. at 1156. The question is whether the court's delay in rendering judgment would violate due process if the death during the delay of a party who otherwise would prevail barred the claim. The court need not decide this question here, but instead looks only to the principles raised by the question.

As in *Logan,* a claimant for workers' compensation benefits would appear to have a protected interest in the claim, 455 U.S. at 429, 102 S.Ct. at 1154, and the state would appear to have little interest in raising a bar with the death of a party. 455 U.S. at 435, 102 S.Ct. at 1157. Such a bar would not distinguish between meritorious and non-meritorious claims. *Id.* Similarly, no action would appear to lie against the court for its delay; there would be no

"post-deprivation remedy." *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Thus, barring claims rather than entering judgment nunc pro tunc would seem to have federal constitutional difficulties.[9]

The court's conclusion that the *Erie* rule requires applying the doctrine of judgment nunc pro tunc is bolstered by the decision of the Ninth Circuit in *Venable v. Meyers,* 500 F.2d 1215 (9th Cir.1974). There, the court expressed doubt whether *Erie* compelled the application of Oregon law over "the power of the federal court to enter judgment *nunc pro tunc.*" 500 F.2d at 1216. However, the court there, as here, did not have to decide the matter since Oregon law appeared identical to federal common law. 500 F.2d at 1216.

For these reasons, the court concludes that it should follow the doctrine of judgment nunc pro tunc, derived from common law, followed by federal and Alabama courts and required by the *Erie* rule.

### C.

Again, entry of judgment nunc pro tunc requires the following: that the cause be ripe for judgment when the party dies; that the delay in judgment not be the fault of the prevailing party; and that innocent third persons acquiring rights since the death of the party will not be injured. 46 Am.Jur.2d *Judgments* §§ 97 & 98.

Here, the court took Hilliard's complaint under submission on November 16, 1984. Hilliard in no way caused delay in entry of judgment. When he died on April 6, 1985, this cause was ripe for judgment. Finally, there is no evidence that any third parties will be injured as a result of entry of judgment in favor of Hilliard. On this basis, Hilliard's motion for the court to enter judgment nunc pro tunc is due to be granted.

Appropriate judgments will be entered.

**9.** In *Smith v. West Point-Pepperell, Inc.,* the facts did not give the court an opportunity to weigh such federal constitutional considerations against its workers' compensation survival rule. No other Alabama court has apparently had this opportunity either.